# Illinois Official Reports

## Appellate Court

---

### *People v. Upshaw*, 2017 IL App (1st) 151405

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICAH UPSHAW, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-15-1405 |
| Filed | October 30, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-09691; the Hon. Kenneth Wadas, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Dean C. Morask, of Park Ridge, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MIKVA delivered the judgment of the court, with opinion.<br>Presiding Justice Pierce and Justice Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1    Micah Upshaw appeals from the second-stage dismissal of his petition for relief under the Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 *et seq.* (West 2000)). Mr. Upshaw contends that the circuit court erred in dismissing his petition without holding an evidentiary hearing. We agree with Mr. Upshaw as to two of the issues raised in his postconviction petition and also agree that he made a substantial showing that he was not culpably negligent for the untimely filing of his petition. We reverse and remand for further proceedings in accordance with this opinion.

¶ 2                                    BACKGROUND

¶ 3    Mr. Upshaw was convicted of two counts of attempted first degree murder, based on a shooting incident that occurred on February 23, 1996, during which two police officers—Officer Joanne Stewart and Officer Bradford Lee—were fired at and Officer Stewart was injured. The evidence presented at Mr. Upshaw's trial and at the hearing on his pretrial motion to suppress a statement he gave to the police is summarized in the order issued by this court in his direct appeal. *People v. Upshaw*, No. 1-99-4043 (2001) (unpublished order under Supreme Court Rule 23). Those facts are set forth here only as necessary to frame the issues raised in this appeal.

¶ 4    In the early morning hours of February 23, 1996, officers Stewart and Lee were in an unmarked car conducting surveillance near 54th Street and Prairie Avenue in Chicago, Illinois. Officer Stewart was shot and severely injured, and Officer Lee got out of the car and chased what he testified to was "one shooter," whom he described at trial as being 25 to 30 years old, 6 feet tall, and weighing 170 pounds. Officer Lee saw the shooter get into the passenger side of a car parked in a nearby alley and leave the area. Neither officer could identify anyone involved in the shooting.

¶ 5    Four days later, Chicago police officer Peck was contacted by an unnamed confidential informant who told Officer Peck that he had overheard people he knew as Bilal and "Little Mike" discussing their involvement in the shooting. The confidential informant gave Officer Peck a description of "Little Mike" and his car that led the police to arrest Mr. Upshaw later that day. The informant then came to the police station and identified Mr. Upshaw as "Little Mike." Bilal Williams was arrested the next day and gave a statement implicating himself and Mr. Upshaw in the shooting. After Mr. Upshaw had been in police custody for approximately 28½ hours, he also gave a statement.

¶ 6    In that statement—which Assistant State's Attorney Joseph Kosman wrote out and Mr. Upshaw initialed and signed—Mr. Upshaw said that he and Bilal Williams were both members of the Gangster Disciples street gang. According to the statement, on the night of February 22 and into the early morning hours of February 23, 1996, Mr. Upshaw and Bilal were driving around together in Bilal's car when they "began to talk about f***ing up" members of a rival gang in retaliation for a drive-by shooting that had occurred earlier that month and in which a fellow Gangster Disciple had been shot. Mr. Upshaw eventually parked the car in a field on the 5400 block of South Calumet Avenue near Prairie Avenue, and Mr. Upshaw and Bilal both got out of the car. Bilal grabbed two guns from the car that he had brought from his house, giving one to Mr. Upshaw. Mr. Upshaw was then following Bilal down Prairie Avenue when Bilal made a "whistle type" sound and began shooting at a parked vehicle. In his statement, Mr.

- 2 -

Upshaw said that he thought that the people inside the parked vehicle were security for the rival gang and that when Bilal began shooting, so did he. Bilal shot eight times, Mr. Upshaw shot three times, and then they both ran back to Bilal's car and drove away.

¶ 7    The jury found Mr. Upshaw guilty on two counts of attempted first degree murder. On November 8, 1999, the trial court imposed an extended-term sentence of 50 years on one count and a sentence of 25 years on the other, to be served consecutively, for a total of 75 years.

¶ 8    On direct appeal, Mr. Upshaw raised three issues, arguing that the trial court erred in refusing to suppress his confession because it was coerced, the State made an improper closing argument, and the consecutive sentences imposed by the trial judge ran afoul of the United States Supreme Court's opinion in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). This court affirmed Mr. Upshaw's convictions and sentence. *Upshaw*, No. 1-99-4043, slip op. at 16. His *pro se* petition for leave to appeal to the Illinois Supreme Court was denied on December 5, 2001. *People v. Upshaw*, 197 Ill. 2d 582 (2001) (table).

¶ 9    On February 14, 2003, Mr. Upshaw mailed to the clerk of the circuit court a *pro se* postconviction petition, arguing in part that his untimely filing of the petition was not due to his culpable negligence. A public defender was appointed to Mr. Upshaw's case on May 16, 2003. Following a delay that is not explained by the parties, on November 4, 2010, the public defender filed a "Supplemental Petition for Post-Conviction Relief-Allegation of Actual Innocence" (supplemental petition), which is the subject of this appeal. The claims in the supplemental petition that are before this court now on appeal are (1) Mr. Upshaw's trial counsel was ineffective for failing to call alibi witness Tyrone White; (2) Mr. Upshaw's appellate counsel was ineffective for (a) failing to challenge Mr. Upshaw's extended-term sentence as violative of *Apprendi*, (b) failing to argue that the trial court erred in barring evidence that another man, Marvin Williams, may have committed the crimes, and (c) failing to argue that the State improperly introduced multiple hearsay identifications of Mr. Upshaw as the shooter; and (3) the denial of Mr. Upshaw's motion to suppress should be reconsidered based on newly discovered evidence of a pattern and practice of coercion by two of the detectives involved in his case.

¶ 10   Multiple documents were attached in support of Mr. Upshaw's petition, including affidavits from himself and from Tyrone White. In his own affidavit, dated April 23, 2009, Mr. Upshaw said that he had informed his trial counsel that he was not involved in the shooting and that he was with Tyrone White at Mr. White's home "at 5132 S. Champlain in Chicago" at the time of the shooting. Mr. Upshaw also said that he gave his trial counsel Mr. White's name, address, and telephone number and that he told his trial counsel that Mr. White would be an alibi witness for him, but that Mr. White was never called to testify.

¶ 11   Mr. White attested, in his affidavit, that on the evening of February 22, 1996, he was at his mother's house "at 6132 S. Champlain," hanging out with Mr. Upshaw, his sister, and a girl named Monique Jackson. Mr. White stated that, at approximately 2 a.m. on February 23, he left the house to visit a friend and, at the time he left, Mr. Upshaw was asleep on the couch. He explained that he remembered "these events" because he passed the scene of what he "later learned was [the] shooting at 54th and Prairie and saw all of the police cars" and because he met a woman that night that he "ended up dating for several years." He discussed the case with Mr. Upshaw prior to the trial and "discussed [his] being an alibi witness for [Mr. Upshaw]." Mr. White said in his affidavit that he would have been willing to testify at Mr. Upshaw's trial but that he was never contacted by Mr. Upshaw's trial counsel.

¶ 12    Mr. Upshaw also attached several documents in support of his argument that two officers involved in his case—detectives Boudreau and Halloran—had a "pattern and practice" of using physical coercion to obtain inculpatory statements from suspects. The details of these documents are discussed later in this opinion. See *infra* ¶¶ 76-77.

¶ 13    On December 7, 2011, the State filed a motion to dismiss Mr. Upshaw's petition, arguing that Mr. Upshaw's initial *pro se* petition was untimely filed. In addition, the State argued that Mr. Upshaw's claims lacked merit. In his response to the motion to dismiss, Mr. Upshaw argued that he was not culpably negligent for the untimely filing of his postconviction petition. He argued that documents he attached to his response demonstrated that, due to no fault of his own, his correctional facility was on general lockdown for 179 days between the time his petition for leave to appeal to the supreme court was denied and when he filed his petition and that staff at the correctional facility library also lost his trial transcripts and legal materials. In support of these arguments, Mr. Upshaw submitted lockdown records for the Stateville Correctional Center (Stateville), his own affidavit explaining that during lockdown he had no access to the prison law library and that it would take two weeks after a lockdown to regain library access, and affidavits from the prison law library staff corroborating that the library staff lost Mr. Upshaw's records as early as March 2002 and that Mr. Upshaw made multiple attempts to retrieve them.

¶ 14    The circuit court held a hearing on the State's motion to dismiss and granted the motion that same day. The circuit court did not directly address Mr. Upshaw's claim that his trial counsel had been ineffective for failing to interview his alibi witness. The circuit court ruled that there was no ineffective assistance of appellate counsel because some issues were, in fact, raised on appeal. The circuit court also agreed with the State that Mr. Upshaw's initial *pro se* postconviction petition filed on February 14, 2003, was untimely because the court was "not sure if the explanation offered in terms of the lockdown actually sufficiently mitigate[d] the untimeliness issue."

¶ 15                                    JURSIDICTION

¶ 16    The circuit court granted the State's motion to dismiss Mr. Upshaw's postconviction petition on April 20, 2015, and Mr. Upshaw timely filed his notice of appeal that same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 606 and 651, governing criminal appeals and appeals from final judgments in postconviction proceedings (Ill. S. Ct. R. 606 (eff. Dec. 11, 2014); R. 651(a) (eff. Feb. 6, 2013)).

¶ 17                                      ANALYSIS

¶ 18    In noncapital cases, postconviction proceedings have three possible stages. *People v. Tate*, 2012 IL 112214, ¶ 9. A petition may only be dismissed at the first stage if it is frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). If a petition advances to the second stage, the stage at which Mr. Upshaw's petition was dismissed, counsel may be appointed to an indigent petitioner (725 ILCS 5/122-4 (West 2000)), the State enters the process as the respondent (725 ILCS 5/122-5 (West 2000)), and the State may move to dismiss the petition (*People v. Gerow*, 388 Ill. App. 3d 524, 526 (2009)). At the second stage, "the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." (Internal quotation marks omitted.) *Tate*,

- 4 -

2012 IL 112214, ¶ 10. "If no such showing is made, the petition is dismissed." *Id.* But if a motion to dismiss is denied, the State must file an answer to the petition (*Gerow*, 388 Ill. App. 3d at 526-27), and if the petitioner sets forth a substantial showing of a constitutional violation, "the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing" (*Tate*, 2012 IL 112214, ¶ 10). "At the second stage, 'all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true.' " *Gerow*, 388 Ill. App. 3d at 526 (quoting *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006)). Because Mr. Upshaw's petition was dismissed at the second stage, we review the dismissal *de novo*. *Pendleton*, 223 Ill. 2d at 473.

¶ 19     We first address the timeliness of Mr. Upshaw's petition. Because we find that Mr. Upshaw has made a substantial showing that the untimely filing of his petition was not due to his culpable negligence, we then address the merits of each of the substantive claims that he raises on appeal.

¶ 20                          A. Timeliness of the Petition

¶ 21     During the relevant time period, the Post-Conviction Act provided that "[n]o proceedings under this Article shall be commenced more than 6 months after the denial of a petition for leave to appeal *** unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122-1(c) (West 2000). Thus, we have held that "[a] petition that is untimely will not be dismissed if the petitioner alleges facts showing that the delay in filing the petition was not due to his or her culpable negligence." *People v. Johnson*, 2017 IL 120310, ¶ 26. According to our supreme court, "culpably negligent" means " 'something greater than ordinary negligence and is akin to recklessness.' " *Id.* (quoting *People v. Boclair*, 202 Ill. 2d 89, 108 (2002)). Our supreme court has recognized that this definition "comports with [its] long-held view that the Act in general must be liberally construed to afford a convicted person an opportunity to present questions of deprivation of constitutional rights." (Internal quotation marks omitted.) *People v. Rissley*, 206 Ill. 2d 403, 420-21 (2003).

¶ 22     The Illinois Supreme Court denied Mr. Upshaw's petition for leave to appeal (PLA) to the supreme court from his direct appeal in this court on December 5, 2001, making his postconviction petition due by June 5, 2002. Mr. Upshaw did not mail his initial *pro se* postconviction petition until February 14, 2003. The date of mailing by the prisoner is considered to be the date of filing. See *People v. Saunders*, 261 Ill. App. 3d 700, 702-03 (1994). It is this delay—from June 5, 2002, until February 14, 2003—that the parties agree is at issue here.

¶ 23     In his original and supplemental petitions, Mr. Upshaw provides two reasons why he is not culpably negligent for this late filing. First, Mr. Upshaw alleges that his unit at the Stateville, where he was then incarcerated, was on lockdown for 179 days between the time that his PLA was denied by the Illinois Supreme Court and the time that he filed his postconviction petition. Second, between December 2001 and March 2002, prison employees lost Mr. Upshaw's trial transcripts and legal materials.

¶ 24     At the second stage of postconviction proceedings, "all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *Pendleton*, 223 Ill. 2d at 473. "[I]n cases where the record contains evidence that the lockdown prevents a [petitioner] from having a 'meaningful opportunity' to prepare a timely postconviction petition, the delay is not

- 5 -

the result of the [petitioner's] culpable negligence." *People v. Van Hee*, 305 Ill. App. 3d 333, 337 (1999). As we have recognized, "[i]n many instances, the only opportunity available to petitioners to learn the procedural and substantive rules governing the preparation of postconviction petitions is through access to the resources available in a law library." *Id.*; see also *People v. Scullark*, 325 Ill. App. 3d 876, 885 (2001) (finding that where a petitioner, who had begun work on a postconviction petition, was then placed in segregation through no fault of his own until the end of the time period for filing, his delay in filing was not due to his culpable negligence).

¶ 25 Here, Mr. Upshaw attached to his response to the State's motion to dismiss records purporting to show the lockdown periods that were imposed at Stateville between 2001 and 2003. While it is not clear that these records precisely match Mr. Upshaw's statement in his affidavit that the facility was on general lockdown for 179 days between the time his PLA to the supreme court was denied and the date his postconviction petition was filed, they do appear to show the following. In the six months between when his PLA was denied and when his postconviction petition was due, the facility was on lockdown for at least 86 days. This court's calculation excluded days in which the records reflect that the lockdown was for only a part of the day. In Mr. Upshaw's affidavit, he states that after a period of lockdown, a new library pass was needed and getting that pass took an additional two weeks. If that is accurate, it means that of the time remaining during which Mr. Upshaw could have been working on his petition in the prison law library before its due date, he had, at most, 27 nonconsecutive days of access. Then, in the 254 days between the petition's due date and the date the petition was filed, this court's own review indicates that Stateville was on lockdown for, at least, an additional 60 days. Due to the two-week delay in regaining library access following each period of lockdown, Mr. Upshaw only had, at most, 90 nonconsecutive additional days of library access before he mailed his petition on February 14, 2003. Thus this court's calculation reflects 146 days in which it appears that a lockdown was in effect for the entire day. Mr. Upshaw also alleged in his affidavit that the lockdowns were due to no fault of his own.

¶ 26 In addition to detailing the lockdowns, the attachments to Mr. Upshaw's postconviction petitions and response to the State's motion to dismiss show that Mr. Upshaw began working on his petition before the due date and was thwarted in his efforts by the fact that prison staff lost his trial transcripts and legal materials. Mr. Upshaw stated in his initial affidavit, attached to his *pro se* postconviction petition, that he asked for assistance on his petition from a law clerk at the Stateville law library, Anthony Williams, on December 7, 2001—just two days after his PLA was denied—and gave Anthony Williams these materials to keep in the library. According to letters that Mr. Upshaw sent to library employees and prison officials as early as February 2002—which were also attached to his *pro se* petition—Mr. Upshaw attempted but was unable to retrieve his records from the library in order to complete his petition. Mr. Upshaw sent six letters between February 2002 and January 2003 asking for access to his records, which he still did not have at the time he filed his *pro se* postconviction petition. That Mr. Upshaw's records were lost sometime in February or March 2002 is further corroborated by the affidavits—attached to his response to the State's motion to dismiss—from Anthony Williams and another clerk employed in the Stateville law library in 2001 and 2002, Dominique Johnson. Thus, while Mr. Upshaw ultimately filed his petition without the aid of his trial transcripts and legal materials, he spent a great deal of time and effort trying to regain

access to these records to help him obtain meaningful postconviction relief. Most significantly, these efforts began immediately after his PLA was denied.

¶ 27    We find that Mr. Upshaw has carried his burden of providing sufficient and specific facts to make a substantial showing that the delay in filing his petition was not due to his culpable negligence. While the State will have the opportunity at an evidentiary hearing to rebut those facts, at this point we must accept them as true.

¶ 28    The State relies on *People v. Cortez*, 338 Ill. App. 3d 122, 130-31 (2003), where this court found that a petitioner's showing that he was in segregation with limited access to the law library was insufficient to meet his burden of showing that his delay was not due to his "culpable negligence." But there the petitioner did not begin to prepare his petition until "long after the due date for filing had passed." *Id.* at 130. That is not true in this case. Moreover, in *Cortez*, the records that the petitioner attached in response to the State's motion to dismiss showed that the petitioner was placed in segregation "due to his own misconduct." *Id.* at 131. Here, Mr. Upshaw has alleged, and the State has not disputed, that the facility was on lockdown through no fault of Mr. Upshaw's. Finally, it appears that in *Cortez*, in contrast to this case, the petitioner did not provide specific dates that he was denied access to the law library, but instead made a more general allegation that he had " 'sharply reduced access.' " *Id.* at 131-32. Given this lack of detail, the *Cortez* court assumed that the petitioner's denial of access to the library was "short in duration." *Id.* at 132. We cannot assume that here.

¶ 29    The State also relies on the holding of our supreme court in *People v. Diefenbaugh*, 40 Ill. 2d 73, 75 (1968), that a "mere allegation that [the petitioner] was unable to obtain" a trial transcript is insufficient to show that he was not culpably negligent for a late filing. Here, however, Mr. Upshaw has not set forth a "mere allegation" that he was unable to obtain a transcript. Rather, his allegations were supported by affidavits from former Stateville law library employees and were combined with supported allegations that his law library access was limited by a series of lockdowns. More importantly, it is not the lack of a transcript alone that Mr. Upshaw relies on to explain his delay in filing. Even if Mr. Upshaw had had his transcript, the State does not dispute that he needed access to the prison law library to be able to put together a *pro se* postconviction petition.

¶ 30    We also note that Mr. Upshaw was only about eight months late in submitting his postconviction petition, and this court has found such a relatively short delay to be a factor in favor of determining that the petitioner did not act with culpable negligence. See *People v. Wilburn*, 338 Ill. App. 3d 1075, 1077-78 (2003) (no culpable negligence where the petitioner filed his postconviction petition 16 months after discovery of the claim and approximately 43 months after it was due); see also *People v. Hernandez*, 296 Ill. App. 3d 349, 352 (1998) (no manifest error in the circuit court's finding that the petitioner was not culpably negligent where he filed his petition 11 months after his claim was established by a change in the law and 14 months after the due date). In contrast, this court found petitioners to be culpably negligent for filing a petition 27 months late (*Gerow*, 388 Ill. App. 3d at 530) and 40 months late (*People v. Ramirez*, 361 Ill. App. 3d 450, 454 (2005)). And in both *Gerow* and *Ramirez*, we specifically noted that the filing delays in *Wilburn* and *Hernandez* were "relatively short" and supported the findings in those cases that the petitioners were not culpably negligent. *Gerow*, 388 Ill. App. 3d at 530; *Ramirez*, 361 Ill. App. 3d at 454.

¶ 31    Bearing in mind that our supreme court has defined culpable negligence as " 'akin to recklessness' " (*People v. Johnson*, 2017 IL 120310, ¶ 26), and taking into consideration the

combined circumstances alleged by Mr. Upshaw—that he had limited access to the law library, he began to work on his petition within days of the denial of his PLA, he was unable to retrieve his lost trial records, and his petition was only eight months late—we find that Mr. Upshaw has made a substantial showing that he was not culpably negligent.

¶ 32 We also reject any argument by the State that the claims in Mr. Upshaw's supplemental petition that were not included in his *pro se* petition are untimely even if his *pro se* claims are not. Our supreme court has made clear that appointed counsel on a postconviction petition "may conduct a broader examination of the record [citation], and may raise additional issues if he or she so chooses." (Emphasis omitted.) *People v. Pendleton*, 223 Ill. 2d 458, 476 (2006). The State has cited no authority to suggest that additional arguments raised in a supplemental petition are under a separate timeline for filing than those raised in a *pro se* petition. See Ill. S. Ct. R. 341(h)(7), (i) (eff. Jan. 1, 2016) (the argument section of the parties' briefs "shall contain the contentions of the [party] *** with citation of the authorities *** relied on").

¶ 33 ## B. The Merits of Mr. Upshaw's Petition

¶ 34 The circuit court must consider, at a third-stage evidentiary hearing, the merits only of those claims on which a petitioner has made a substantial showing of constitutional error at the second stage. *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 55. We consider whether Mr. Upshaw has made this necessary showing on each of his claims. As we explain below, we find that Mr. Upshaw has made a substantial showing of a constitutional error on two of his claims, but find that the circuit court properly dismissed the remainder of his claims.

¶ 35 ### 1. Ineffective Assistance of Trial Counsel—Alibi Witness

¶ 36 Mr. Upshaw argues that he made a substantial showing that his trial counsel was ineffective for failing to investigate an alibi witness, Tyrone White. We agree.

¶ 37 Ineffective assistance of counsel claims are considered under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Gale*, 376 Ill. App. 3d 344, 351 (2007). To succeed on an ineffective assistance claim, a defendant must satisfy both components of the test:

> " 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction *** resulted from a breakdown in the adversary process that renders the result unreliable.' " *People v. Coleman*, 168 Ill. 2d 509, 528 (1995) (quoting *Strickland*, 466 U.S. at 687).

¶ 38 Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Thus, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in [light of] all [of] the circumstances, [and] applying a heavy measure of deference to counsel's judgments." *Id.*

¶ 39    Although the decision of whether to present a witness is generally considered a matter of trial strategy, "counsel may be deemed ineffective for failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense." *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999). Moreover, "strategic decisions may be made only after there has been a 'thorough investigation of law and facts relevant to plausible options.' " *People v. Gibson*, 244 Ill. App. 3d 700, 703-04 (1993) (quoting *Strickland*, 466 U.S. at 690). Thus, this court had held that " '[t]he failure to interview witnesses may indicate actual incompetence [citation], particularly when the witnesses are known to trial counsel and their testimony may be exonerating [citation].' " *People v. Davis*, 203 Ill. App. 3d 129, 140-41 (1990) (quoting *People v. Greer*, 79 Ill. 2d 103, 123 (1980)).

¶ 40    The affidavits of Mr. Upshaw and Mr. White attached to Mr. Upshaw's supplemental petition support a substantial showing that trial counsel was deficient for failing to contact Mr. White as a possible alibi witness, meeting the first prong of the *Strickland* test. Mr. Upshaw alleged in his affidavit that he was with Mr. White at Mr. White's home at the time of the shooting, that he provided his trial counsel with Mr. White's address and telephone number, and that he told trial counsel that Mr. White would be willing to serve as an alibi witness. Mr. White similarly attested in his affidavit that he and Mr. Upshaw were together on the night of the shooting, that he had reason to remember that night, and that he "saw all of the police cars" when he drove past 54th Street and Prairie Avenue at about 2 a.m. Mr. White also stated that he would have testified at Mr. Upshaw's trial but was never contacted by counsel. The record suggests no strategic reason that counsel may have decided not to investigate Mr. Upshaw's alibi or not to even interview Mr. White. Taking the facts presented in the affidavits as true, as we must at this stage (*Pendleton*, 223 Ill. 2d at 473), Mr. Upshaw met his burden of making a substantial showing that his trial counsel was deficient.

¶ 41    Consideration, under the second prong of the *Strickland* test, of whether counsel's failure to investigate prejudiced Mr. Upshaw requires us to look at the evidence presented at Mr. Upshaw's trial. "Prejudice is demonstrated if there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." *People v. Makiel*, 358 Ill. App. 3d 102, 105-06 (2005). "Whether defense counsel was ineffective for failure to investigate is determined by the value of the evidence that was not presented at trial and the closeness of the evidence that was presented." *Id.* at 107.

¶ 42    The State concedes that neither victim could identify Mr. Upshaw or his codefendant, Bilal Williams, as the shooter; no weapon was recovered, no physical evidence tying Mr. Upshaw or Bilal to the shooting was recovered, and there was evidence that the initial description of the shooter did not come close to matching Mr. Upshaw's appearance. As discussed later in this opinion, the trial court admitted evidence of out-of-court statements by Bilal Williams and an unnamed confidential informant that identified Mr. Upshaw as being involved in this crime, under the theory that these statements explained the course of the police investigation. However, neither of those out-of-court statements was admissible for the truth of the matter asserted. Thus, the State's entire case against Mr. Upshaw rested on the inculpatory statement he finally gave after he spent 28½ hours in police custody.

¶ 43    According to the statement—which Assistant State's Attorney Kosman read to the jury and testified that he wrote out and had Mr. Upshaw sign—Mr. Upshaw and Bilal Williams were both members of the Gangster Disciples street gang. In early February 1996, Mr. Upshaw was

with a fellow gang member, Little Moose, when Little Moose was shot in the back during a drive-by shooting. Mr. Upshaw recognized one of the shooters as a "BD," a rival gang member. The night of the shooting, Mr. Upshaw was standing on the corner of 62nd Street and St. Lawrence Avenue when Bilal pulled up in his car. Mr. Upshaw got into the car, and they drove to Bilal's house, where Bilal got two black automatic handguns. As they were driving around, they saw six or seven "BDs" standing in front of a sandwich shop on the south side of 55th Street between Calumet Avenue and Prairie Avenue. The two "began to talk about f***ing up some BD over what happened to Little Moose." They parked the car and Bilal grabbed the guns, handing Mr. Upshaw a 9-millimeter weapon. They exited the car at 55th Street and walked west toward Prairie Avenue. Bilal turned north on Prairie Avenue, and Mr. Upshaw followed. They passed a parked car, then Bilal "made a whistle type sound to alert" Mr. Upshaw. According to the statement, the two of them then began shooting into the car because they believed the car "contained security for the BDs across the street." Mr. Upshaw was "about even with the car's right front tire," and when Bilal started shooting, so did Mr. Upshaw. The two then ran back to Bilal's car and drove to the alley behind Bilal's house. Bilal took the guns, and Mr. Upshaw left.

¶ 44    Mr. Upshaw's statement was inconsistent with the events as described by Officer Lee, who testified that there was only one shooter and that the shooter ran into the alley and entered the passenger side of a waiting car. The police investigating the crime testified that Officer Lee described the shooter as 6 feet tall, between 25 and 30 years old, and weighing 160 or 170 pounds. At trial, a police officer testified that he spoke with Mr. Upshaw in January 1996, and Mr. Upshaw at that time was approximately 5 feet, 5 inches tall and weighed 125 pounds. Mr. Upshaw's trial counsel focused on these inconsistencies and the lack of any corroboration to argue to the jury that Mr. Upshaw's statement was coerced and should not be believed. Trial counsel also argued that the police failed to make reasonable attempts to find Mr. Upshaw's mother once they learned that he was a juvenile and that they kept Mr. Upshaw in a room at the station for 29 hours "to wear him down, to get him to sign a statement."

¶ 45    The jury sent a note to the trial court during deliberations asking for transcripts of the testimony given by Detective Coughlin and Assistant State's Attorney Kosman, the two witnesses for the State who testified about Mr. Upshaw's statement. The jury note read: "we are at an impass[e] about the believability of the statement. Any legal counsel would be appreciated." The trial court responded: "You have heard all the evidence and have been instructed on the law. Continue to deliberate."

¶ 46    In short, the only evidence against Mr. Upshaw was his statement, which the jury had reasons to disbelieve and about which at least some jurors had doubt. In light of this, we agree with Mr. Upshaw that, based on this record, if trial counsel had interviewed and presented Mr. White as an alibi witness, there is a reasonable probability that the result of the trial would have been different.

¶ 47    The State argues that "defense counsel obviously chose to pursue the strategy with the jury that, due to [Mr. Upshaw's] youth, and the fact that he was alone with experienced law enforcement personnel when he confessed, that his confession should not be believed by them," apparently suggesting that offering an alibi would be inconsistent with this strategy. But such a defense strategy would only have been strengthened by Mr. White's alibi testimony.

¶ 48 The State also makes much of the differences between Mr. Upshaw's affidavit and Mr. White's affidavit, including the difference in the address provided (5132 S. Champlain Avenue versus 6132 S. Champlain Avenue), who the house belonged to (Mr. White versus Mr. White's mother), and who was present (Mr. White versus Mr. White, Mr. White's sister, and Monique Jackson). The difference in one digit of the address could well be a clerical error. The remaining differences are simply not inconsistencies: the house may have been where Mr. White lived at the time while now only his mother lives there and it is possible that everyone Mr. White mentioned was at his house that night but Mr. Upshaw did not include the fact that they were present in his account. The State also argues that Mr. Upshaw failed to show that counsel had a way to contact Mr. White. However, Mr. Upshaw says in his affidavit that he provided his trial counsel with Mr. White's telephone number.

¶ 49 Our conclusion that the failure to investigate this alibi witness necessitates a third-stage evidentiary hearing is supported by this court's decisions in *Tate*, 305 Ill. App. 3d 607, and *Makiel*, 358 Ill. App. 3d 102. In *Tate*, a petitioner was convicted of first degree murder and attempted first degree murder. *Tate*, 305 Ill. App. 3d at 608-10. On appeal from the second-stage dismissal of his postconviction petition, the petitioner argued that trial counsel's failure to call three alibi witnesses amounted to ineffective assistance. *Id.* at 610. This court found that the petitioner made a substantial showing that he received ineffective assistance of counsel, noting that, considering the evidence in the alibi witnesses' affidavits as true, "it supports [the petitioner's] theory that he was misidentified, and there is no apparent strategic reason for not calling them to testify." *Id.* at 611-12. Although the State argued that the trial counsel's decision must have been strategic because counsel interviewed two of the three alibi witnesses and decided not to call them, the court said it could not "say as a matter of law that was counsel's reasoning" and accordingly remanded for an evidentiary hearing. *Id.* at 612-13.

¶ 50 In *Makiel*, the petitioner appealed from the second-stage dismissal of his postconviction petition, alleging ineffective assistance of trial counsel for failure to call a witness to testify at trial who, according to his affidavit, "would have directly contradicted" the testimony of the State's key witness. *Makiel*, 358 Ill. App. 3d at 106-09. This court found that the record reflected "no strategic reason" for defense counsel's failure to contact, interview, subpoena, or call this witness, and therefore the circuit court improperly dismissed the petitioner's postconviction petition at the second stage. *Id.* at 109. The court remanded for a third-stage evidentiary hearing. *Id.* at 120.

¶ 51 Here, we reach a conclusion similar to those reached by the *Tate* and *Makiel* courts; Mr. Upshaw has made a substantial showing that his trial counsel was ineffective for failing to investigate Mr. White. Not only could Mr. White's proposed testimony have supported the defense theory at trial, but there is simply nothing in the record to suggest that trial counsel's failure to investigate Mr. White's potential as an alibi witness was a strategic choice. We find that Mr. Upshaw has made a substantial showing that he received ineffective assistance of trial counsel by his counsel's failure to investigate Mr. White as an alibi witness, and the circuit court should proceed to a third-stage evidentiary hearing on that claim.

¶ 52 2. Ineffective Assistance of Appellate Counsel—*Apprendi*

¶ 53 Mr. Upshaw also contends that his appellate counsel was ineffective for failing to argue on direct appeal that the trial court improperly sentenced him to an extended-term prison sentence of 50 years for attempted first degree murder, based on the court's own finding that his offense

was "accompanied by exceptionally brutal behavior indicative of wanton cruelty." Mr. Upshaw argues that, pursuant to the Supreme Court's decision in *Apprendi*, 530 U.S. 466, the finding that this factual predicate to an enhanced sentence existed could only have been made by the jury.

¶ 54     "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175 (2000). "A petitioner who contends that appellate counsel rendered ineffective assistance of counsel must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced petitioner." *Id.* A petitioner can show that he was prejudiced by appellate counsel's failure to raise an issue on appeal if "there is a reasonable probability that, but for appellate counsel's errors, the appeal would have been successful." *People v. Golden*, 229 Ill. 2d 277, 283 (2008). "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Easley*, 192 Ill. 2d 307, 329 (2000).

¶ 55     When this offense was committed, the sentencing range for attempted first degree murder, a Class X felony, was 6 to 30 years in prison. 720 ILCS 5/8-4(c)(1) (West 1996); 730 ILCS 5/5-8-1(a)(3) (West 1996). Illinois law provided that, if a court found that "the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" (730 ILCS 5/5-5-3.2(b)(2) (West 1996)), the court had the discretion to sentence a defendant convicted of attempted first degree murder to a prison sentence in the range of 30 to 60 years (730 ILCS 5/5-8-2(a)(2) (West 1996)). The trial court made this finding and sentenced Mr. Upshaw to 50 years in prison.

¶ 56     In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

¶ 57     Our supreme court has made clear that, without a jury finding beyond a reasonable doubt that the crime was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty," the extended-term sentencing provision used by the trial court here to impose a 50-year extended-term sentence on Mr. Upshaw is inconsistent with *Apprendi*. *People v. Nitz*, 219 Ill. 2d 400, 405, 409 (2006); *People v. Swift*, 202 Ill. 2d 378, 388 (2002). And at the time Mr. Upshaw's appeal was pending, two cases from this district had already found extended-term statutes similar to the one at issue here to be unconstitutional under *Apprendi*. *People v. Beachem*, 317 Ill. App. 3d 693, 707-08 (2000) (finding unconstitutional statutory provisions that allowed the court to sentence a defendant to between 60 and 100 years for the offense of first degree murder if the court found that the murder was " 'accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty' " (quoting 730 ILCS 5/5-5-3.2(b)(2) (West 1996))), *vacated*, 201 Ill. 2d 577 (2002) (supervisory order); *People v. Lee*, 318 Ill. App. 3d 417, 419-21 (2000) (finding unconstitutional statutory provisions that allowed a court to sentence a defendant to natural life imprisonment for a conviction of murder on the basis of the same court finding); see also *People v. Joyner*, 317 Ill. App. 3d 93, 109-10 (2000) (a Second District case finding extended-term sentencing provisions unconstitutional under *Apprendi*).

¶ 58    As the State points out, because Mr. Upshaw's trial counsel failed to object to the *Apprendi* error, a plain error analysis would have been applied on appeal. This is the procedural posture our supreme court had before it in *Nitz*, 219 Ill. 2d at 409-11. There, the supreme court held that if trial counsel failed to object to an *Apprendi* violation, such a violation only provided a basis for reversal under the plain error doctrine if the "evidence was closely balanced as to whether [the petitioner's] crime was exceptionally brutal or heinous and indicative of wanton cruelty." *Id.* at 420-21.

¶ 59    In *Nitz*, the supreme court found that the petitioner failed to make this showing because the trial evidence showed that he struck the murder victim repeatedly in the head with a baseball bat, shot the victim, and then severed the victim's head in an attempt to conceal the ballistics evidence. *Id.* at 403. The petitioner also told a witness that he had put the "remainder of the body in the trunk of the victim's car" then "tried to burn the car." *Id.* at 417. Our supreme court defined the terms "brutal," "heinous," and "indicative of wanton cruelty" by their "ordinary and popular meaning," explaining:

> "For behavior to be heinous, it must be 'hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal.' [Citation.] We defined brutal behavior as 'behavior that is grossly ruthless, devoid of mercy or compassion; cruel and cold-blooded.' [Citation.] Brutal or heinous behavior generally involves prolonged pain, torture, or premeditation [citation], but does not necessarily require them [citation]. Behavior must qualify as either brutal or heinous for the sentencing enhancement to apply. [Citation.]

> In addition to being exceptionally brutal or heinous, the crime must also be indicative of wanton cruelty. ' "[W]anton cruelty" requires "proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense." ' [Citation.]" *Id.* at 418.

The *Nitz* court went on to find that the "cold-blooded" act of severing and concealing the victim's head, "denying his family the closure of burying their loved one intact," and the repeated striking of the victim in the head with a bat supported the finding that the petitioner's offense was brutal and displayed wanton cruelty. *Id.*

¶ 60    Mr. Upshaw argues that, here, "no such finding of brutal or heinous behavior can be justified." In stark contrast to the facts of *Nitz*, here the offense involved no extended violence, beating, or beheading, and no attempt to burn a decapitated body. Instead, the offense involved what the State claimed was a gang shooting, in which the perpetrators believed that the individuals in the car were serving as security for a group of rival gang members across the street. According to the State's theory, the shooters approached the vehicle, fired several shots in quick succession, and immediately ran away. The record in this case also reflects that Mr. Upshaw's codefendant—who was older than Mr. Upshaw and, according to the trial evidence, was the leader of this crime—pled guilty and received a total sentence of 15 years. While we do not dismiss the seriousness of this crime or the severity of Officer Stewart's injuries, the State points to no facts supporting a finding that this crime was exceptionally brutal or heinous and indicative of wanton cruelty. These are the findings that, under *Apprendi*, should have been made by the jury " 'beyond a reasonable doubt.' " *Apprendi*, 530 U.S. at 490. As our supreme court has observed, "[a]ll murders are brutal and heinous to a certain degree. *** Section 5-8-2, however, allowing for extended-term sentences, was not intended to convert

- 13 -

every offense into an extraordinary offense subject to an extended-term sentence." (Internal quotation marks omitted.) *People v. Andrews*, 132 Ill. 2d 451, 466 (1989).

¶ 61    In sum, even under plain error analysis, appellate counsel could have easily shown that the evidence to support an extended-term sentence was either nonexistent or, at best, closely balanced. Counsel was clearly aware of *Apprendi* at the time Mr. Upshaw's appeal was filed, as evidenced by the fact that counsel challenged Mr. Upshaw's consecutive sentences as an *Apprendi* violation. Thus, Mr. Upshaw has made a substantial showing that appellate counsel's failure to raise the claim that Mr. Upshaw's extended-term sentence violated *Apprendi* was objectively unreasonable and prejudiced him. Accordingly, we find the circuit court erred in dismissing this claim at the second stage of postconviction proceedings.

¶ 62                        3. Other Errors by Appellate Counsel

¶ 63    Mr. Upshaw also contends that appellate counsel was ineffective for failing to raise two other arguments on appeal: that the trial court refused to allow evidence that another person, Marvin Williams, may have committed the shooting; and that the trial court admitted out-of-court statements by Mr. Upshaw's codefendant, Bilal Williams, and an unnamed "confidential informant" that accused Mr. Upshaw of this shooting, under the theory that these statements were admitted only to explain the police investigation. But both of these rulings were within the discretion of the trial court and we cannot find that the failure of appellate counsel to raise either of these issues meets the *Strickland* standard. As noted above, we will not find ineffective assistance by appellate counsel's choice not to brief an issue on appeal, unless the failure to do so "is patently wrong." *Easley*, 192 Ill. 2d at 329.

¶ 64                                    a. Marvin Williams

¶ 65    Mr. Upshaw argues that appellate counsel was deficient in failing to argue that the trial court abused its discretion in prohibiting him from presenting evidence that a man named Marvin Williams, who matched the description given by witnesses of the shooter, presented himself at Mercy Hospital, which was only three miles away, within two hours of the shooting, had a hand injury, and tested positive for gunshot residue despite claiming not to have fired a gun.

¶ 66    Although it is true that an accused "may attempt to prove that someone else committed the crime with which he is charged," "this right is not without limitations." *People v. Ward*, 101 Ill. 2d 443, 455 (1984). "[I]f the evidence is too remote or too speculative, or if it fails to link a third person with the commission of the crime, then the trial court should exclude the evidence." *People v. Fort*, 248 Ill. App. 3d 301, 314 (1993). The decision of whether to admit evidence is within the trial court's discretion, "and its ruling should not be reversed absent a clear showing of abuse of that discretion." *Ward*, 101 Ill. 2d at 455-56. "An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Baez*, 241 Ill. 2d 44, 106 (2011).

¶ 67    Appellate counsel may have legitimately concluded that this court would find that the trial court's decision to bar evidence regarding Marvin Williams was within its discretion. No one identified Marvin Williams as being at the scene of the shooting. Although Marvin Williams's gunshot residue test yielded a positive result and he lied about having fired a gun that evening, having fired a gun does not mean that he shot officers Stewart and Lee. Without something

more connecting Marvin Williams to the shooting, we cannot say that the trial court's decision to bar this evidence was so arbitrary or unreasonable that appellate counsel's failure to raise this issue was "patently wrong." In addition, as the State points out, the failure on the part of defense counsel at trial to have made a complete offer of proof on the evidence that the petitioner would have presented on this point might have resulted in forfeiture of this issue on appeal. *People v. Wood*, 341 Ill. App. 3d 599, 604 (2003) ("When evidence is refused, no appealable issue remains unless a formal offer of proof is made."). The circuit court therefore is not required to hold a third-stage evidentiary hearing regarding whether appellate counsel was deficient for failure to raise this argument.

¶ 68                                           b. Out-of-Court Statements

¶ 69      Mr. Upshaw also argues that his appellate counsel was ineffective for failing to challenge the admission of out-of-court statements made by his codefendant, Bilal Williams, and by an unnamed confidential informant that either directly or indirectly identified Mr. Upshaw as being involved in the crime. These out-of-court statements were presented to the jury through the testimony of the police officers investigating the shooting. The State argued at trial and argues now on appeal that this testimony was properly admitted to explain the course of the police investigation that led to Mr. Upshaw's arrest. We need not decide if this evidence was properly admitted because we find that Mr. Upshaw's petition does not make a substantial showing that appellate counsel's failure to raise this issue on appeal amounted to ineffective assistance.

¶ 70      The testimony at issue came from officers Peck and Worsham, and Detective Halloran. According to that testimony, the unnamed confidential informant told the police that "Little Mike" had shot the officers together with "Bilal." The confidential informant provided details to the police about "Little Mike's" car that matched the car that Mr. Upshaw was found in, and another officer testified at trial that, in 1994, Mr. Upshaw had said that his nickname was "Little Mike G." Detective Halloran testified at Mr. Upshaw's trial that Bilal Williams had made a statement "implicating himself and this defendant."

¶ 71      A criminal defendant has a right to be confronted with the witnesses against him under both the United States and Illinois Constitutions. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. For that reason, hearsay—an out-of-court statement offered to prove the truth of the matter asserted—is generally inadmissible at trial. *People v. Tenney*, 205 Ill. 2d 411, 432 (2002). Mr. Upshaw argues that the above-challenged testimony was problematic because the "whole range of inference, starting with [Officer] Peck, led inevitably to [Mr. Upshaw] being accused by those who never took the witness stand to be cross examined." But when an out-of-court statement is offered "for the limited purpose of showing the course of a police investigation," that statement is not considered to be hearsay. *People v. Williams*, 181 Ill. 2d 297, 313 (1998). An officer may establish his course of conduct by testifying that he "had a conversation with an individual" and that he "subsequently acted on the information received." (Internal quotation marks omitted.) *People v. Mims*, 403 Ill. App. 3d 884, 897 (2010).

¶ 72      Considering the record as a whole, we cannot find that Mr. Upshaw made a substantial showing that his appellate counsel was ineffective for failing to challenge this testimony on direct appeal. Where, as here, the police made an arrest a few days after the shooting in an area unconnected to the scene of the shooting, the trial court's allowance of testimony to provide some explanation as to why the police proceeded as they did was not unreasonable. We also

note that the trial court instructed the jury that the evidence was to be considered not for the truth of the matter asserted, but only for the purpose of understanding the police investigation. "We must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict." *Williams*, 181 Ill. 2d at 314. Evidentiary rulings are reviewed deferentially on appeal because the trial court has the advantage over the appellate court of having heard the witnesses firsthand. See *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). We cannot say that it was patently erroneous for appellate counsel not to raise the issue on appeal. *Coleman*, 168 Ill. 2d at 523. Thus, the circuit court need not hold a third-stage evidentiary hearing on this issue.

¶ 73                           4. Newly Discovered Evidence of Abuse by Detectives

¶ 74        Mr. Upshaw's supplemental petition also purports to raise "newly discovered evidence of the pattern and practice of abuse of suspects" by detectives Halloran and Boudreau. Mr. Upshaw argues that if this evidence had been considered in conjunction with his motion to suppress, the result of the motion would have been different. This issue would generally be barred by the doctrine of *res judicata* because the claim that Mr. Upshaw's statement should have been suppressed was rejected on direct appeal (*Upshaw*, No. 1-99-4043, slip op. at 10-14). *People v. Reyes*, 369 Ill. App. 3d 1, 15 (2006) ("Issues that were decided on direct appeal are barred by *res judicata*."). But "our supreme court has recognized that, 'in the interests of fundamental fairness, the doctrine of *res judicata* can be relaxed if the defendant presents substantial new evidence.' " *Id.* (quoting *People v. Patterson*, 192 Ill. 2d 93, 139 (2000)).

¶ 75        For new evidence to be sufficient to overcome the bar of *res judicata* and warrant a new trial, the evidence (1) must have been discovered since trial and be of such character that the petitioner could not have discovered it sooner through due diligence, (2) must be material and not merely cumulative of existing trial evidence, and (3) must be "of such conclusive character that it will probably change the result on retrial." *Patterson*, 192 Ill. 2d at 124. Here, Mr. Upshaw has failed to make a substantial showing that his newly discovered evidence is of such a "conclusive character that it [would] probably change the result on retrial." *Id.* Therefore, the circuit court properly dismissed this claim.

¶ 76        Mr. Upshaw's postconviction petition includes a newspaper article that Mr. Upshaw alleges "catalog[ues] Detective Boudreau's coercive interrogation exploits," a report from the Chicago police department office of professional standards showing five complaints filed against Detective Boudreau between January 1992 and August 1994, and affidavits from eight individuals "outlining Detective Boudreau and Halloran's coercive interrogation practices." The affidavits include specific allegations of abusive tactics used by detectives Halloran and Boudreau in January and February 1992 and again in February 1993, September 1995, April and September 1996, and March 1998, including arresting suspects without a warrant; failing to inform suspects of their *Miranda* rights; handcuffing suspects to the wall during many hours of interrogation; denying suspects access to lawyers, use of a telephone, food, water, or trips to the bathroom until they agreed to cooperate; choking, punching, slapping, and kicking suspects; suffocating suspects with a plastic bag; electrically shocking suspects; and beating suspects with a flashlight.

¶ 77        Mr. Upshaw also attached records from the Illinois Torture Inquiry and Relief Commission in three cases: *In re Claim of George Ellis Anderson*, Ill. Torture Inquiry & Relief Comm'n Cl.

No. 2011.016-A (2012) (allegations that suspect was "beaten repeatedly, including being kicked on the wrists while he was handcuffed to the wall" and "threatened with further beatings if he didn't sign a confession" by detectives Halloran and Boudreau in August 1991), *In re Claim of Clayborn Smith*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.007-S (2013) (allegations that suspect was interrogated over a period of 39 hours by detectives Halloran and Boudreau, during which time he was "threatened, beaten, portions of his hair braids came undone because his head was jerked around" in October 1992), and *In re Claim of Anthony Jakes*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.035-J (2013) (allegations that a 15-year-old suspect was interrogated over a period of 16 hours by Detective Boudreau, during which time he was "slapped, punched, beaten, and kicked" and sustaining injuries to his "back, stomach, knee, elbow, and ribs" in September 1991).

¶ 78     Mr. Upshaw testified at some length during the hearing on his motion to suppress, recounting his many hours of detention and stating that several of the officers involved in the investigation slapped him, poked him with a stick, and struck him with their fists—and that this was why he signed the statement. The trial court denied the motion to suppress based on its determination that Mr. Upshaw was not credible.

¶ 79     Despite the horrific conduct described in the documents that he attaches, Mr. Upshaw cannot meet his high burden of demonstrating that this new evidence is of such conclusive character that it would probably change the result on retrial in his case. The attached newly discovered evidence all describes conduct by two officers—detectives Halloran and Boudreau—in other cases. It is not at all clear that Mr. Upshaw ever claimed that either of these detectives was the perpetrator of the physical abuse against him. In his supplemental petition, Mr. Upshaw only says that the record establishes "that Detectives Boudreau and Halloran were the lead detectives on the case and, by Detective Halloran's testimony, the two [d]etectives were involved in [Mr. Upshaw's] interrogations during the time when [Mr. Upshaw] alleged that the coercive tactics outlined in his testimony were employed." At the hearing, Mr. Upshaw made attempts to identify the officers whose conduct he was describing by giving physical descriptions, but was not able to identify any of the officers by name, and the record is clear that both detectives Halloran and Boudreau were off duty for many hours before Mr. Upshaw agreed to sign his statement.

¶ 80     Also, Mr. Upshaw's newly discovered evidence concerns conduct that is quite different from what he alleges happened to him. Evidence of other bad acts is not admissible to prove "a propensity" to commit bad acts but can be used to show "a course of conduct on the part of the officers involved." *Reyes*, 369 Ill. App. 3d at 18. This case stands in sharp contrast to the *Patterson* case that Mr. Upshaw relies on. In *Patterson*, our supreme court found newly presented evidence of coercion was sufficient to justify a third-stage postconviction evidentiary hearing, in part because the petitioner's claims were "strikingly similar" to the police abuse described in his new evidence. *Patterson*, 192 Ill. 2d at 145. We do not find Mr. Upshaw's allegations of physical abuse to be "strikingly similar" to the allegations in the new evidence. Mr. Upshaw alleged he was beaten with a stick on the way to the police station, handcuffed to the wall for a short duration of time in the beginning of his 28½-hour detainment, and was left alone for large periods of time during which he slept. He was also taken to the bathroom and eventually given food. In contrast, the affidavits attached and the Illinois Torture Inquiry and Relief Commission case reports generally describe very different conduct, including repeated beatings by punching, kicking, hitting with a flashlight and a

- 17 -

rubber hose, choking, and the use of electric shock and suffocation. This newly discovered evidence does not provide a sufficient basis for holding a third-stage evidentiary hearing.

¶ 81                                              CONCLUSION

¶ 82        In sum, because we find that Mr. Upshaw made a substantial showing that he was not culpably negligent for the delayed filing of his petition, we find that the circuit court erred in dismissing his postconviction petition as untimely. We also find that Mr. Upshaw made a substantial showing of constitutional violations with respect to two issues raised in his petition: that his trial counsel was ineffective for failing to investigate his alibi witness, Tyrone White, and that his appellate counsel was ineffective for failing to challenge his extended-term sentence of 50 years based on *Apprendi*. This case is remanded to the circuit court for a third-stage evidentiary hearing on these three issues. For the foregoing reasons, we reverse the circuit court's dismissal of Mr. Upshaw's postconviction petition and remand for further proceedings consistent with this opinion.

¶ 83        Reversed and remanded.