2020 IL App (1st) 182506-U

No. 1-18-2506

FIFTH DIVISION
NOVEMBER 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 5354 |
| | ) | |
| ANTHONY ROBINSON, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where defendant's *pro se* postconviction petition raised an arguable claim of ineffective assistance of trial counsel based on counsel's failure to investigate and call two alibi witnesses, we reverse the summary dismissal of the petition and remand the motion for second-stage proceedings.

¶ 2    The defendant Anthony Robinson, who was convicted of first degree murder, appeals from the trial court's summary dismissal of his postconviction petition for relief filed pursuant to the

Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1 *et seq.* (West 2018). On appeal, the defendant contends that his petition should not have been summarily dismissed because it presented an arguable claim of ineffective assistance of trial counsel based on counsel's failure to present two alibi witness who were available and known to counsel. For the reasons that follow, we reverse the ruling of the circuit court of Cook County and remand the case to the trial court for second-stage proceedings.

¶ 3    The defendant's conviction arose from the January 1, 2013, shooting death of Kelvin Jemison in Chicago. After his arrest, the defendant was charged with 24 counts of first degree murder, two counts of attempted first degree murder, and one count of aggravated discharge of a firearm. The matter proceeded to a joint bench trial with codefendants Antwoine Hill and Clyde Jackson. Following the 2014 trial, the defendant was convicted of one count of first degree murder and sentenced to 55 years' imprisonment. On direct appeal, this court affirmed the defendant's conviction and sentence. *People v. Robinson*, 2017 IL App (1st) 152605-U. In our order entered at that time, we set forth the underlying facts of the case. However, because of the nature of the defendant's current claim, those facts will be repeated here in detail.

¶ 4    At trial, Dwayne Rolle, who was called as a witness by the State, acknowledged that he had previously been convicted of burglary. He testified that at approximately 2 or 2:30 p.m. on January 1, 2013, while he and Kelvin Jemison were walking together, he noticed the same car two or three times. He did not remember what color the car was or how many doors it had. The third time he saw the car was near East 45th Street and South Champlain Avenue. A person exited the passenger side of the car and started shooting. In court, when the prosecutor asked Mr. Rolle to look around the courtroom and indicate whether he saw that person, Mr. Rolle answered; "Nobody.

None of them ain't ever get out the car. I never looked back when they start shooting. I never looked back, period." Mr. Rolle explained that although he did not see anyone shooting, he heard "a lot" of gunshots. He ran from the scene, took shelter at the side of a building, and then went to a friend's residence nearby. Mr. Rolle did not see or hear the decedent, Mr. Jemison fall, but heard about Mr. Jemison's death from other people who had gone outside after the shooting stopped. Mr. Rolle did not talk with the police at the scene because he "had a warrant that day." He stated that he did not know who shot Mr. Jemison.

¶ 5     Mr. Rolle testified that on January 8, 2013, he spoke with two detectives at the police station and viewed "a couple" photo arrays. When asked whether he identified anyone in the photo arrays, he answered, "That I knew, yeah." When asked whom he identified, he responded, "I forgot." However, when shown the photo array in court, he acknowledged that he had marked two photos with an X and written the initials "B.A." on one of the photos. He stated that he knew the defendant by the name B.A. and he identified the defendant in court. The other person whom he had marked with an X was codefendant Clyde Jackson, whom he also identified in court. When asked what he told the detectives that the defendant had done, Mr. Rolle answered, "I didn't tell him nothing. All I told him was they asked me questions do I know them. I said yes, I know them." Mr. Rolle further stated that the detectives "made it seem like they were the shooters so I went along with them." Specifically, he told the detectives that the defendant shot Mr. Jemison while Clyde Jackson acted as a lookout. Mr. Rolle further acknowledged during his testimony that he marked an X on codefendant Antwoine Hill's photo in a separate photo array. He identified Antwoine Hill in court and stated that he had told the detectives that Mr. Hill was also a lookout during the shooting.

¶ 6    Mr. Rolle testified that he went back to the police station on February 13, 2013, and stayed there until the next day. He did not remember viewing two physical lineups during that time but, in court, acknowledged his signature on two lineup advisory forms from that time frame. Mr. Rolle recalled speaking with an Assistant State's Attorney (ASA) while he was at the police station and also recalled giving her and a detective a videotaped statement. Mr. Rolle agreed that he watched the videotaped statement before testifying, but, initially, stated that he did not remember what he said on the video, explaining, "It has been two years ago." After further questioning, Mr. Rolle stated that he remembered saying on video that codefendants Mr. Jackson and Mr. Hill stood by the car and acted as lookouts, while the defendant chased him and Mr. Jemison on foot, and that the defendant shot Mr. Jemison. The parties agreed that the videotaped statement would be played for the court, and the court would disregard any prior consistent statements. The videotaped statement is not included in the record on appeal.

¶ 7    Mr. Rolle agreed that he testified before a grand jury on March 7, 2013, and that during that testimony, he stated that when the car stopped, the defendant, Mr. Jackson, and Mr. Hill "hopped out." Mr. Rolle could not see the driver, but the defendant had been in the passenger's seat and Mr. Jackson and Mr. Hill had been in the back seat. Mr. Rolle knew the defendant, Mr. Jackson, and Mr. Hill because he used to be friends with them. He recognized them on the day of the shooting because he "looked back for a second and [he] realized their face[s]." Mr. Rolle started running "[b]ecause [he] was getting shot at." When Mr. Rolle "glanced back," he saw the defendant shooting at him and saw Mr. Jemison running behind him. Mr. Jackson and Mr. Hill were standing by the side of the car looking around. Mr. Rolle described the defendant's gun as a

"40 or a 9." He did not know how many shots the defendant fired but said it was "a lot." Mr. Rolle ran into a nearby residence.

¶ 8    Mr. Rolle acknowledged that prior to testifying at trial, he had watched a surveillance video of the shooting. He agreed that the video truly and accurately showed what happened at 2:45 p.m. that day. The State published the video, the trial court admitted it into evidence, and segments were played for the court. Mr. Rolle identified himself and the victim, Mr. Jemison in the video. The video is not included in the record on appeal.

¶ 9    On cross-examination, Mr. Rolle reiterated that he identified the defendant, Mr. Jackson, and Mr. Hill because he knew them, not because he had seen them on the day of the shooting. He stated that when he testified before the grand jury, he was told "they" would say what happened and he was just supposed to answer yes or no. He testified that when he first spoke with the detectives, they told him that if he did what they wanted, they "would not deal with [his] warrant at that time." Mr. Rolle claimed that he did not try to correct the detectives because he was too nervous. When Mr. Rolle was shown a still shot of the shooting from the surveillance video, he identified himself and said he did not see anyone standing outside the car. Mr. Rolle agreed that in the video, the person chasing him did not have dreadlocks. Mr. Rolle stated that he did not remember the shooting very well and did not see the shooter. He stated, "[O]nly thing I know for a fact [is] they didn't kill [Mr. Jemison]."

¶ 10    On redirect, Mr. Rolle agreed that he gave certain answers when he testified before the grand jury. Specifically, he had testified that the defendant exited the car's passenger seat with a gun, pointed it at him and Mr. Jemison, started shooting at them, and chased them. Mr. Rolle had also testified before the grand jury that Mr. Jackson and Mr. Hill exited the back seat, looked

around, and started chasing him and the victim, Mr. Jemison. Mr. Rolle had further testified that when he was shown photo arrays, he identified the defendant, Mr. Jackson, and Mr. Hill as people involved in the shooting.

¶ 11    On re-cross examination, Mr. Rolle testified that he went along with what the detectives told him because he was 17 at the time and was "dumb" and nervous.

¶ 12    The parties stipulated that if called as a witness, Tikiea Poa would have testified that at approximately 1:30 p.m. on the day in question, she was in a parking lot in the 4500 block of South Champlain Avenue when she saw a black, four-door Chevrolet, possibly a Cobalt, with three occupants, drive through the parking lot. The driver looked at her and waved as he drove past. Ms. Poa left to run errands and returned at around 4:30 or 4:45 p.m. As she was putting away groceries, she heard five to six gunshots. On January 6, 2013, Ms. Poa viewed a photo array composed of nine photos. She identified defendant as the man she saw driving the Chevrolet through the parking lot on the day in question. On February 14, 2013, Ms. Poa viewed a lineup. She could not identify anyone in the lineup with certainty but indicated that the driver was either in position number two or three. The defendant was in position number three.

¶ 13    Chicago police detective Roger Murphy testified that he was assigned to investigate Mr. Jemison's homicide. When he arrived at the scene, he canvassed occupants of nearby buildings and spoke with several witnesses. He compiled photo arrays, which he showed to the witnesses. On January 8, 2013, he interviewed Mr. Rolle after learning that he was in custody on a juvenile warrant. Detective Murphy showed Mr. Rolle three photo arrays. In the first, Mr. Rolle identified the defendant as the person who shot Mr. Jemison and identified codefendant Mr. Jackson, as a person who was with the defendant at the time of the shooting. Mr. Rolle did not identify anyone

in the second photo array. In the third photo array, he identified codefendant Mr. Hill as another person who was with the defendant during the shooting. Mr. Rolle later identified the defendant, codefendants Mr. Jackson, and Mr. Hill in physical lineups. Detective Murphy testified that Mr. Rolle never said that he did not see who was shooting and he never indicated that he identified the defendant, and codefendants Mr. Jackson, and Mr. Hill simply because he knew them.

¶ 14    On cross-examination, Detective Murphy stated that among the witnesses he interviewed at the scene were Lakesha Joseph and Tameka Mingo. Ms. Joseph told Detective Murphy that she witnessed the shooting. Detective Murphy talked with Ms. Mingo a couple of blocks from the location of the shooting because she did not want to talk to the police at the scene. She told Detective Murphy that she saw gunshots and people running. During his investigation, Detective Murphy learned that a black, four-door Chevrolet Cobalt may have been involved in the incident, but he also learned that neither the defendant, codefendants Mr. Jackson, nor Mr. Hill owned such a car. The police recovered .40-caliber cartridge casings at the scene. In March 2013, Detective Murphy received a notification from the Illinois State Police that the gun that fired the recovered cartridges had been recovered and was associated with a suspect who was not the defendant, codefendants Mr. Jackson, or Mr. Hill. On further cross-examination, Detective Murphy testified that when the defendant was arrested on February 13, 2013, he had "long, long hair" in braids to his shoulders, was 5 feet 7 inches tall, and weighed 140 pounds.

¶ 15    After the State rested, each defendant made a motion for a directed finding. The trial court granted Mr. Jackson's and Mr. Hill's motions, but denied the defendant's motion.

¶ 16    Tameka Mingo testified for the defense that at approximately 2:45 p.m. on the day in question, she was walking to her car, which was parked in a lot behind a housing complex on the

4800 block of South Evans Avenue. She heard gunshots and got into the back seat of her car. She saw two men running toward her, one of whom was shooting. She described the shooter as dark, thin, and a little shorter than her son, who was 6 feet 3 inches tall. She also said the shooter had a short haircut. Ms. Mingo looked around the courtroom and did not see anyone she recognized as the shooter. Ms. Mingo saw the other man fall about three feet from her car. The shooter ran from the scene. At some point, Ms. Mingo spoke with two detectives about what she had seen.

¶ 17    On cross-examination, Ms. Mingo testified that the shooter had his hood up but she could see his eyes and face. However, she did not tell the detectives she had seen the shooter's eyes and face. On redirect, she explained that she did not give this description to the detectives because she did not feel safe when they were questioning her.

¶ 18    In response to questions posed by the trial court, Ms. Mingo explained that even though the shooter had his hood up, she could tell he had short hair because he looked right at her. She explained, "He had a hood on but his hair was short throughout the hood *** the way the hood was." On redirect, Ms. Mingo stated she could see the shooter's neck because the hood was "open" and she did not see any hair on his neck.

¶ 19    Lakesha Joseph testified for the defense that at approximately 2:30 p.m. on the day in question, she was leaving her residence when she saw a man with a gun chasing another man past her door. The gunman fired several times. One bullet hit Ms. Joseph's gate and ricocheted into her courtyard. The victim was hit near the security guard stand. After the shooting, the shooter ran back past Ms. Joseph's residence in the direction from which he had originally come. She described the shooter as about 6 feet 1 inch tall with a medium dark complexion. She stated he did not have any hair. Ms. Joseph looked around the courtroom and stated she did not see the shooter.

When she was asked to look specifically at the defendant, she stated he did not look "at all" like the shooter because the shooter was taller and had no hair. Ms. Joseph testified that she talked to two detectives after the shooting and told them what she had witnessed. At some point, the police showed her two photo arrays. She told the police that she did not see the shooter in the photo arrays. She was not asked to view a lineup or give a statement at the police station.

¶ 20     On cross-examination, Ms. Joseph agreed that the shooter was wearing a hoodie and a hat. She stated she could see the hat because the hood "wasn't all the way on." On redirect, she explained that the shooter's hood was "down a little" and his hat was "low," so if he had had hair or dreadlocks, she would have been able to see the hair sticking out from under the hat.

¶ 21     The trial court found the defendant guilty of one count of first degree murder for personally discharging a firearm that caused Mr. Jemison's death. The court noted that the State's "main witness," Mr. Rolle, "said just about every version of the events" at trial. As such, the trial court found that Mr. Rolle was "absolutely incredibly unbelievable" when he testified at trial. The court also found that Ms. Mingo and Ms. Joseph were not credible. However, the court stated that Mr. Rolle did not "sway" or "wobble" in his videotaped statement or before the grand jury when he identified the defendant as the shooter. The court subsequently sentenced the defendant to a term of 55 years in prison.

¶ 22     On direct appeal, the defendant challenged the sufficiency of the evidence, arguing that the State's case relied on the disavowed prior inconsistent statements of Mr. Rolle, a witness the trial court "in so many words called *** a liar." We rejected the defendant's arguments and affirmed his conviction. *People v. Robinson*, 2017 IL App (1st) 152605-U.

¶ 23    On April 18, 2018, the defendant filed a *pro se* postconviction petition under the Act, alleging, *inter alia*, ineffective assistance of trial counsel based on counsel's failure to interview and call two alibi witnesses, Denzell Stewart and Kenneth Bell, whose affidavits he attached to his petition. The defendant asserted that both witnesses were available at the time of trial but, although he made trial counsel aware of both witnesses numerous times, counsel made no effort to investigate them and did not allow them to testify. In a self-executed affidavit attached to the petition, the defendant asserted that prior to trial, he told trial counsel to contact Denzell Stewart and Kenneth Bell because they would have provided him an alibi, but counsel failed to do so.

¶ 24    In an attached affidavit, Mr. Bell averred that on January 1, 2013, he was with Mr. Stewart, who was his brother, and the defendant, who was his cousin, playing video games in his bedroom from 11 a.m. to 4 p.m. According to Mr. Bell, the defendant did not leave the apartment until after 4 p.m. Mr. Bell remembered the date because they had been at Dave & Buster's the night before, celebrating Mr. Stewart's birthday. Mr. Bell further averred that at the time in question, the defendant had a leg injury from a gunshot wound and "could barely stand up straight unless on crutches."

¶ 25    Mr. Stewart averred in his affidavit that he was sure he, the defendant, and Mr. Bell were at his apartment on January 1, 2013, playing video games "at 2:45pm *** and long enough after for [the defendant] to have not been where the crime took place." Mr. Stewart also noted that he, the defendant, and Mr. Bell had been out at Dave & Buster's celebrating Mr. Stewart's birthday the night before and had slept in "kind of late" on the day in question.

¶ 26    On June 29, 2018, in a written order, the circuit court summarily dismissed the defendant's petition as frivolous and patently without merit. With regard to the defendant's claim that trial

counsel was ineffective for failing to investigate and interview Mr. Stewart and Mr. Bell, the circuit court found that counsel made a strategic choice not to call the two witnesses at trial and that the defendant was not prejudiced by counsel's decision. On December 3, 2018, the defendant filed a motion for leave to file a late notice of appeal, which this court granted.

¶ 27    On appeal, the defendant contends that his petition stated an arguable claim that trial counsel rendered ineffective assistance for failing to investigate and present the testimony of two known and available alibi witnesses, Mr. Stewart and Mr. Bell.

¶ 28    The Act provides a three-stage process for adjudication of a petition. 725 ILCS 5/122-1 (West 2018); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The instant case involves the first stage of the process, during which the trial court independently assesses the petition, taking the allegations as true. *Hodges*, 234 Ill. 2d at 10. Based on this review, the trial court must determine whether the petition "is frivolous or is patently without merit," and, if it so finds, the court must dismiss the petition. 725 ILCS 5/122-2.1(a)(2) (West 2018).

¶ 29    A petition may be dismissed as frivolous or patently without merit "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition has no arguable basis in law when it is founded on "an indisputably meritless legal theory," for example, a legal theory that is completely belied by the record. *Id.* A petition has no arguable basis in fact when it is based on a "fanciful factual allegation," which includes allegations that are "fantastic or delusional" or contradicted by the record. *Id.* at 16-17; *People v. Morris*, 236 Ill. 2d 345, 354 (2010). Our review of a first-stage dismissal is *de novo*. *Hodges*, 234 Ill. 2d at 9. Pursuant to this standard, we review the trial court's judgment, not the reasons given for it. *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 30    Traditionally, to establish ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) but for counsel's errors, there is a reasonable probability that the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, our supreme court has indicated that in the context of first-stage postconviction proceedings, a defendant need not conclusively establish these factors. In *Hodges*, our supreme court held that "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 31    In this court, defendant contends that his petition raised an arguable claim of ineffective assistance of trial counsel based on counsel's failure to call Mr. Stewart and Mr. Bell as witnesses in his defense. He asserts that there was no physical evidence connecting him to the shooting, that he never made an inculpatory statement, that two eyewitnesses who did not know him testified that he was not the shooter, and that the only evidence implicating him was Mr. Rolle's prior inconsistent statements. As such, he maintains that Mr. Stewart's and Mr. Bell's testimony—that he was elsewhere at the time of the shooting and was unable to run due to a leg injury—would have supported the defense theory that he was not the shooter, who had been running while firing a gun. The defendant argues that where the outcome of the case turned on a credibility contest between the defendant's two occurrence witnesses and Mr. Rolle's prior inconsistent statements, Mr. Stewart's and Mr. Bell's testimony could have tipped the balance in his favor. The defendant maintains that, taking the allegations in the affidavits which support his petition as true, he stated

an arguable claim that he was prejudiced by trial counsel's failure to investigate and present Mr. Stewart and Mr. Bell as alibi witnesses at trial.

¶ 32    The State responds that trial counsel's decision regarding which witnesses to call was a matter of trial strategy. The State argues that Mr. Stewart and Mr. Bell would have carried little weight as witnesses because they were the defendant's cousins and their testimony would not have affected the outcome of the trial because it was rebutted by the record. The State maintains that the evidence of the defendant's guilt was overwhelming where Ms. Poa identified him as driving a black, four-door Chevrolet earlier in the afternoon on the day of the shooting and where Mr. Rolle consistently identified him as the shooter when he spoke with detectives, during his videotaped statement, and in front of the grand jury. Therefore, according to the State's argument, there is no reasonable probability that the alibi testimony would have affected the outcome of the trial.

¶ 33    After reviewing the record, we find that the defendant has stated an arguable claim that trial counsel was ineffective for failing to investigate and call Mr. Stewart and Mr. Bell as alibi witnesses. It is true that in general, an attorney's decision regarding which witnesses to call is a matter of trial strategy that is immune from claims of ineffective assistance of counsel. *People v. West*, 187 Ill. 2d 418, 432 (1999). However, counsel may be deemed ineffective for failing to present exculpatory evidence of which he is aware, including failing to call a witness whose testimony would support an otherwise uncorroborated defense. *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 39; *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999). More importantly, questions of trial strategy are inappropriate at the first stage of postconviction proceedings. *People v. Tate*, 2012 IL 112214, ¶ 22.

¶ 34    In this case, the defense theory was that the defendant was misidentified as the person who shot and killed Mr. Jemison. Defense counsel noted in opening statements that there was no physical evidence connecting his client to the shooting and that the defendant had not confessed. Counsel also argued that the shooter depicted in the surveillance video was much taller than the defendant and did not have dreadlocks as the defendant did, and maintained that the only eyewitness to identify the defendant was expected to recant and therefore should not be believed. Counsel returned to these themes when arguing for a directed finding, noting the lack of physical evidence, asserting that the shooter in the video did not resemble the defendant, and arguing that Mr. Rolle's identification of the defendant should not be given any weight because he was a liar. In closing, counsel reiterated his earlier arguments and urged the trial court to believe Ms. Joseph and Ms. Mingo, who had both testified that the defendant was not the shooter. Mr. Stewart's and Mr. Bell's proposed testimony that the defendant was with them on the afternoon of the shooting would have provided the defendant with an alibi and, therefore, would have corroborated the defense theory of misidentification. See *Upshaw*, 2017 IL App (1st) 151405, ¶ 51 (proposed alibi witness's testimony would have supported defense theory at trial).

¶ 35    The averments made by Mr. Stewart and Mr. Bell in their affidavits, which we must consider as true at this point in the proceedings (see, *e.g.*, *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 14), support the defense theory that the defendant was misidentified. The defendant's own affidavit, which is also taken as true, supports his claim that counsel was aware of Mr. Stewart's and Mr. Bell's existence. As such, we find it is at least *arguable* that trial counsel performed unreasonably in failing to investigate and call either Mr. Stewart and Mr. Bell as alibi witnesses. See *Tate*, 2012 IL 112214, ¶ 24; see also *Upshaw*, 2017 IL App (1st) 151405, ¶ 40

(affidavits of defendant and potential alibi witness supported a substantial showing that trial counsel was deficient for failing to investigate the alibi); *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 60 (counsel's failure to call available exculpatory witnesses constituted a substantial showing that his representation was objectively unreasonable).

¶ 36    We further find it arguable that the defendant was prejudiced by the absence of Mr. Stewart and Mr. Bell on the witness stand. On this issue, we find *Tate*, 2012 IL 112214, instructive. In *Tate*, the Illinois Supreme Court reversed the summary dismissal of a postconviction petition because it was arguable that the defendant was prejudiced by his trial counsel's failure to investigate or call four witnesses, two of whom could have provided the defendant with an alibi defense. *Id.* ¶¶ 4, 24-25. The State's case against the defendant had consisted of the testimony of four eyewitnesses. *Id.* ¶ 24. No murder weapon was recovered, no fingerprints or DNA linked the defendant to the crime, and there was no confession. *Id.* The defendant attached four affidavits to his petition: two affiants provided the defendant with an alibi; a third affiant stated he did not see the defendant anywhere near the shooting; and the fourth affiant averred he was five feet from the victim at the time of the shooting, he witnessed the shooting, he had known the defendant for years, and he was sure the defendant was not the shooter. *Id.* ¶ 5. Our supreme court observed that the fourth affiant's testimony, which it characterized as "illustrative," would have provided a first-person account of the incident which directly contradicted the prior statements of the State's eyewitnesses. *Id.* ¶¶ 23, 24. The court concluded that "the affidavits attached to [the defendant's] postconviction petition meet the 'arguable' *Strickland* test for first-stage petitions" and that the "affidavits are sufficient for his petition to advance to the second stage of postconviction proceedings." *Id.* ¶¶ 23, 25.

¶ 37     Here, as in *Tate*, the State's case rested on eyewitness testimony. Also as in *Tate*, no gun was recovered, no physical evidence linked the defendant to the crime, and the defendant did not confess. Although, unlike the fourth affiant in *Tate*, Mr. Stewart and Mr. Bell did not aver they were at the scene of the shooting and were sure that the defendant was not the shooter, they did aver that they were with the defendant at their residence during the time frame in which the shooting occurred. As in *Tate*, this proposed testimony from Mr. Stewart and Mr. Bell would have contradicted the testimony of the State's witness, who identified the defendant as the shooter. In these circumstances, we find, as our supreme court did in *Tate*, that it is at least arguable that the defendant was prejudiced by the lack of Mr. Stewart and Mr. Bell as witnesses. See *id.* ¶ 24; see also *Upshaw*, 2017 IL App (1st) 151405, ¶ 46 (where the defendant's inculpatory statement was the only evidence against him, there was a reasonable probability that the result of the trial would have been different had trial counsel interviewed and presented an alibi witness).

¶ 38     Having concluded that the defendant has established an arguable constitutional claim of ineffective assistance of trial counsel for failure to investigate and call Mr. Stewart and Mr. Bell, as witnesses at trial, we reverse the summary dismissal of his petition. Because partial dismissals of postconviction petitions are not allowed at the first stage of the proceedings, we remand the entire petition to the trial court for second-stage proceedings. See *People v. Rivera*, 198 Ill. 2d 364, 370-72 (2001) (where a petition contains an allegation that is not frivolous or patently without merit, the entire petition must be docketed for second stage proceedings).

¶ 39     For the reasons explained above, we reverse the trial court's dismissal of the defendant's petition and remand the matter to the circuit court of Cook County for further proceedings consistent with this order under the Act.

¶ 40    Reversed and remanded.