2023 IL App (1st) 220703-U

No. 1-22-0703

Order filed May 4, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 27061 |
| | ) | |
| LARRY STEELE, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The judgment of the trial court denying defendant leave to file a fourth successive petition for post-conviction relief is affirmed.

¶ 2     This case arises from the Post-Conviction Hearing Act (the Act), 725 ILCS 5/122-1 *et seq.*, and its bar on successive petitions for post-conviction relief. Defendant Larry Steele appeals from the January 28, 2022, judgment of the circuit court of Cook County which denied him leave to file his fourth successive petition for post-conviction relief.

¶ 3    Defendant argues that he has made the *prima facie* showing of both cause and prejudice necessary to be permitted leave to file his successive petition.

¶ 4    For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 5                                        I. BACKGROUND

¶ 6                                    A. Trial and Direct Appeal

¶ 7    The case before us concerns defendant's fourth successive petition under the Act, and his fifth petition in total. Underlying these petitions is defendant's 2007 conviction for first degree murder for which he received a sentence of 80 years. In this Court's September 30, 2009, order affirming defendant's conviction, we summarized the trial testimony and will repeat here only what is necessary for the resolution of the instant appeal. *People v. Steele*, No. 1-07-2489 (2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 8    Defendant and his brother, Morrell Steele (codefendant Morrell), were charged with first degree murder stemming from the shooting death of Andre Dunlap (Dunlap) that occurred on October 6, 2004. The two were tried jointly before separate juries.

¶ 9    Three eyewitnesses, Lugene Shipp (Shipp), Gerrod Smith (Smith), and Quincy Jones (Jones) provided the juries with their accounts of what transpired. All three men, plus Dunlap, were members of the same street gang. While out walking, they encountered defendant and codefendant Morrell, who were members of a rival gang. Defendant called Dunlap names, and a fistfight ensued.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 10    Shipp testified that during the fight, codefendant Morrell entered a nearby house and returned carrying a chrome gun. Codefendant Morrell handed the gun to defendant and said, "here, killer." Defendant chased Dunlap down the street, firing approximately nine times. Defendant went inside and codefendant Morrell told the individuals still outside that "I'm not the killer. I'm the humble one. That's the killer right there."

¶ 11    Smith's testimony detailed the fight between Dunlap and defendant, which ended in defendant sitting on his porch. Smith then went inside a nearby building to purchase marijuana and heard gunshots while he was inside. After the gunshots ceased, Smith exited the building. He did not see Dunlap or defendant. When police arrived, Smith told them he did not know who was responsible for the shooting. Smith denied telling detectives that he saw codefendant Morrell hand a gun to defendant or that he saw defendant fire at Dunlap ten to 12 times. He also denied hearing codefendant Morrell say anything to defendant.

¶ 12    However, Smith admitted meeting with Assistant State's Attorney Diana Garcia-Camillo (Garcia-Camillo) and Detective Thomas Vovos (Vovos) and, in that meeting, he admitted seeing codefendant Morrell hand a gun to defendant and that defendant fired ten to 12 times at Dunlap. Those statements were reduced to writing and Smith signed it. Smith testified that he told Garcia-Camillo that he was giving his statement freely and voluntarily.

¶ 13    Smith was also confronted with his grand jury testimony in this case in which he said that codefendant Morrell handed defendant a gun and said, "here, killer," and that defendant opened fire at Dunlap. Smith asserted that he was not truthful in his grand jury testimony, and that he only testified to the contents of his written statement.

¶ 14    The State responded to Smith's recantation with multiple impeachment witnesses. According to the testimony of Vovos, Smith told Vovos that on the day of the shooting, Dunlap saw a gun in defendant's hand and fled, and that defendant fired ten to 12 times. Although it was not memorialized in writing or on video, Vovos also testified that he questioned defendant and that defendant confessed that codefendant Morrell handed him a gun and that he fired multiple times at Dunlap.

¶ 15    Garcia-Camilo testified that she drafted a nine-page statement from her conversation with Smith, that Smith signed every page, and that she and Smith initialed corrections to the document. That statement was admitted as evidence and read to the jury. Assistant State's Attorney Egan testified that she met with Smith just prior to his grand jury testimony and that she was the one who questioned Smith before the grand jury. She testified that Smith never told her that his written statement was false. The contents of Smith's grand jury testimony were also published to the jury.

¶ 16    Jones testified similarly to Shipp in that he saw codefendant Morrell pass defendant a chrome gun, and that defendant fired the weapon multiple times at Dunlap. His testimony differed from Shipp in that he said defendant was standing still while firing rather than chasing Dunlap down the street.

¶ 17    At the start of his direct examination, Jones insisted that he had never been known by the name "David." He admitted he had been convicted of aggravated criminal sexual assault in two separate cases in 2006, as well as aggravated unlawful use of a weapon in 2003, and robbery and aggravated battery in 2000. Jones never heard codefendant Morrell say anything to defendant when defendant was handed the gun. He testified that he did not go to the police station willingly, and while he was never told as much, he assumed that he was under arrest.

¶ 18     During codefendant Morrell's cross-examination of Jones, for which defendant's jury was excused, Jones testified that he was arrested after the shooting and placed in a cell. He initially believed he was a suspect in the shooting. He testified that he did not tell a detective that he saw codefendant Morrell hand a gun to defendant. He again denied using the name "David," but subsequently admitted that he used the name "David" when he testified before the grand jury for this case.

¶ 19     He did so because he believed there might have been an existing warrant for his arrest based on a parole violation, and he believed using a different name during his grand jury testimony would help him avoid arrest. However, he insisted that his grand jury testimony, which maintained that he saw codefendant Morrell hand defendant a gun, was not a lie. Defendant's attorney did not engage in a similar line of cross-examination, and thus only codefendant Morrell's jury heard testimony about Jones using a false name in front of the grand jury.

¶ 20     Defendant was found guilty of first degree murder, but codefendant Morrell was found not guilty. Upon direct appeal, we affirmed, finding no error in the admission of codefendant Morrell's statements being admitted in the case against defendant.

¶ 21                           B. Previous Post-Conviction Proceedings

¶ 22     Defendant's first post-conviction petition was filed on August 3, 2011. Defendant claimed that trial counsel provided ineffective assistance for failing to investigate and develop a self-defense strategy and because trial counsel failed to apprise him of his right to testify or prepare him to testify. He further alleged the ineffectiveness of appellate counsel on direct appeal and that he was denied a fair trial on the basis that one juror wrote to the trial court professing her belief

that defendant was innocent. On October 14, 2011, the trial court summarily dismissed that petition at the first stage as being frivolous and patently without merit, and we affirmed.

¶ 23    On November 25, 2013, defendant filed a motion for leave to file a successive post-conviction petition and claimed that the trial court erred by failing to conduct a fitness hearing and that trial counsel provided ineffective assistance for failing to request a fitness hearing. He also claimed that the trial court abused its discretion by sentencing him to 80 years' imprisonment. The trial court denied leave to file the successive petition and we affirmed.

¶ 24    Defendant filed a motion for leave to file his second successive petition on August 17, 2016. That successive petition again raised the claim that the trial court failed to hold a fitness hearing and that trial counsel provided ineffective assistance by failing to request a fitness hearing. Defendant also raised again the issue of the juror's letter in which she professed her belief that defendant was innocent. Finally, defendant claimed that the State elicited perjured testimony during the grand jury proceedings in this case. The trial court denied leave to file the successive petition, and we affirmed on January 24, 2020.

¶ 25    Defendant filed a motion seeking leave to file his third successive petition on April 25, 2019. Defendant claimed that his sentence violated the Proportionate Penalties Clause of the Illinois Constitution and the Eighth Amendment of the United States Constitution because the trial court failed to consider defendant's intellectual disability. The trial court denied leave to file, and on August 13, 2021, we again affirmed.

¶ 26                    C. The Instant Successive Post-Conviction Petition

¶ 27    On December 8, 2021, defendant filed the instant motion for leave to file a successive petition which attached the accompanying instant petition. That petition alleged that defendant had

been denied a fair trial because Jones admitted during the trial that he lied under oath to the grand jury to evade criminal charges of his own. Defendant claimed that Jones' false testimony induced the grand jury to find probable cause where none existed. Defendant framed this issue as both one of actual innocence and that trial counsel and appellate counsel were ineffective for failing to build a defense around Jones' false testimony to the grand jury. He further alleged that he had not raised these issues previously because his transcripts of the proceedings were destroyed while he has been incarcerated.

¶ 28    The trial court denied defendant's motion for leave to file his fourth successive petition on January 28, 2022, and this appeal followed.

¶ 29                                   II. ANALYSIS

¶ 30    The sole issue before us is whether the trial court erred by denying defendant leave to file a successive petition for post-conviction relief. We review this question *de novo* and, as we would in reviewing a first-stage petition, we take as true all well-pleaded facts in the petition and in the supporting affidavits. *People v. Bailey*, 2017 IL 121450, ¶ 13; *People v. Pitsonbarger*, 205 Ill. 2d 444, 467 (2002).

¶ 31    The Act provides a mechanism by which a defendant may raise a collateral attack against his or her conviction based on a claim of actual innocence or where there was a substantial denial of his or her rights under the Constitution of the United States, the State of Illinois, or both. 725 ILCS 5/122-1 *et seq.* Issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered forfeited. *People v. Davis*, 2014 IL 115595, ¶ 13. The Act contemplates filing only one petition for post-conviction relief, but the trial court may allow successive petitions upon a

showing of cause and prejudice. *Davis*, 2014 IL 115595 at ¶ 14. A defendant faces immense procedural hurdles when bringing a successive post-conviction petition and, because successive petitions impede the finality of criminal litigation, these hurdles are lowered only in very limited circumstances. *Id*. One basis for relaxing these hurdles is where a defendant can establish both cause and prejudice for the failure to raise the claim in his initial post-conviction petition.

¶ 32    "Cause" refers to some objective factor that impeded the defendant's ability to raise the claim in an earlier proceeding, while "prejudice" refers to a constitutional error that so infected the entire trial that the resulting conviction or sentence violates due process. *Davis*, 2014 IL 115595 at ¶ 14; 725 ILCS 5/122-1(f). To meet the cause-and-prejudice test for successive petitions, a defendant must "submit enough in the way of documentation to allow a circuit court to make that determination." *People v. Smith*, 2014 IL 115946, ¶ 35.

¶ 33    The initial cause-and-prejudice determination is made on the pleadings rather than from an evidentiary hearing, and a defendant need not establish cause and prejudice conclusively in order to be granted leave to file a successive petition for post-conviction relief. *Bailey*, 2017 IL 121450 at ¶¶ 22-25. Instead, a defendant must only make a *prima facie* showing of cause and prejudice. *Id*. at ¶ 24.

¶ 34    The cause-and-prejudice test is a higher standard than the "frivolous or patently without merit" standard that the trial court employs during first stage proceedings. *Smith*, 2014 IL 115946 at ¶ 35; 725 ILCS 5/122-2.1(a)(2). Leave of court to file a successive post-conviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where

the successive petition with supporting documentation is insufficient to justify further proceedings. *Smith*, 2014 IL 115946 at ¶ 35.

¶ 35    Although defendant framed his underlying claims in terms of both actual innocence and ineffective assistance, we note that defendant's brief has proceeded only by claiming that defendant established cause and prejudice for failing to raise his ineffective assistance claim earlier. We thus address the issues of whether defendant demonstrated cause and prejudice for that ineffective assistance claim in turn.

¶ 36                                        A. Cause

¶ 37    Defendant asserts that he has made a facial showing of an objective factor which impeded his ability to raise his claims during prior post-conviction proceedings, relying heavily on *People v. Upshaw*. We disagree and find *Upshaw* to be meaningfully distinguishable in multiple ways.

¶ 38    In *Upshaw*, the trial court dismissed the petitioner's post-conviction petition on the basis that it was untimely. *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 14. We reversed, holding that the petitioner made a substantial showing that he was not culpably negligent in the late filing of his petition. *Id*. at ¶¶ 21-32, 82.

¶ 39    After the Illinois Supreme Court denied the petitioner leave to appeal on December 5, 2001, his initial post-conviction petition was due by June 5, 2002. *Id*. at ¶ 22. He did not place his petition in the mail until February 14, 2003. *Id*. The petitioner explained this delay by claiming that Stateville, where petitioner was incarcerated, was locked down for 179 days between when his petition for leave to appeal was denied and when his post-conviction petition was due, and that between December 2001 and March 2002, prison employees lost the petitioner's trial transcripts and legal materials. *Id*. at ¶ 23. To support his claim, petitioner attached records which showed

that the facility was locked down for at least 86 days during the relevant time period. *Id.* at ¶ 25. He also alleged that after a lockdown period, inmates were required to get a new law library pass, which took two weeks to obtain. *Id.* This meant that the petitioner had only 27 nonconsecutive days of law library access before his petition was due, and 90 additional nonconsecutive days of access between the time when the petition was due and when it was filed. *Id.*

¶ 40     The petitioner also attached letters which showed he left his legal materials and transcripts in the custody of a law clerk at the Stateville law library, as well as affidavits from multiple clerks which averred that the petitioner's paperwork had been lost. *Id.* at ¶ 26.

¶ 41     The first of many differences between *Upshaw* and this case is that we are dealing with whether defendant established cause to file his fourth successive post-conviction petition, and his fifth petition overall, rather than whether he was culpably negligent for failing to file his first post-conviction petition on time. *Id.* at ¶ 22. We have defined "culpably negligent" as something that is "greater than ordinary negligence and is akin to recklessness." *Id.* at ¶ 21. Section 122-1(c) of the Act sets out this culpable negligence standard as it pertains to initial post-conviction petitions, and the plain language of this section does not apply this same, less stringent burden to successive petitions. 725 ILCS 5/122-1(c). The culpable negligence exception in the Act is meant to act as a "special safety valve." *People v. Rissley*, 206 Ill. 2d 403, 420 (2003) (*quoting People v. Bates*, 124 Ill. 2d 81, 88 (1988)). But the cause-and-prejudice test is, instead, meant to safeguard the finality of litigation by imposing immense procedural hurdles on successive petitions. *Davis*, 2014 IL 115595 at ¶ 14. Defendant here must show much more than only that he was not reckless in failing to raise his claims sooner.

¶ 42    Second, the petitioner in *Upshaw* filed his petition approximately eight months after the deadline had lapsed, whereas here, more than a decade passed between the filing of defendant's initial post-conviction petition and when he finally raised this claim in the instant successive petition. *Upshaw*, 2017 IL App (1st) 151405 at ¶ 22.

¶ 43    Third, the instant case is also distinguishable from *Upshaw* because of the defendant's lack of specificity and documentation. In *Upshaw*, the petitioner provided specific timeframes when he could not access the law library, supported by documentation, and his claim that his transcripts and legal materials were lost was supported by letters he wrote to the Stateville law clerks, as well as affidavits from the clerks who had possession of those materials. *Id*. at ¶¶ 25-26. Here, the defendant only makes the unsupported assertion that his claim was recently discovered because the "majority of his transcripts" were lost or destroyed during shakedowns at Menard Correctional Center. Defendant's reply brief misses the point when it claims that specifics are unnecessary because we must accept defendant's factual allegations as true.

¶ 44    Yes, we are required to accept well-pleaded facts as true. *Pitsonbarger*, 205 Ill. 2d at 467. But we are not required to make speculative or inferential leaps in defendant's favor in lieu of specifics, and we are not required to blindly accept his claim that the destruction of his transcripts was an objective factor that prevented him from raising this claim in his initial petition in 2011. To the contrary, we are required to consider whether defendant's legal claims fail as a matter of law, and whether his successive petition and supporting documentation are sufficient to justify further proceedings. *Smith*, 2014 IL 115946 at ¶ 35. That standard would be hollow if we were required to not only accept well-pleaded facts as true, but also defendant's conclusions and legal claims.

¶ 45    As defendant has repeatedly sought leave to file successive petitions in 2013, 2016, 2019, and now 2021, the question of when these materials were lost, and when the claim was subsequently discovered, is critical to the question of whether there was an objective factor that prevented defendant from raising this claim sooner. For example, if defendant's transcripts were lost in 2019, there was nothing impeding him from raising this claim in his first petition in 2011. Likewise, if his transcripts were destroyed in 2010, when he obtained new copies is also directly relevant to the consideration of whether an objective factor prevented him from raising this claim in his first petition. And as the State points out, defendant's initial petition in 2011 quoted large sections of the direct examination of "Quincy (David) Jones," seemingly rebutting the notion that defendant did not have transcripts of Jones' testimony in 2011.

¶ 46    Even assuming the truth of defendant's claim that his trial transcripts were lost or destroyed at some unknown, indefinite point in time, that does not establish that there was an objective factor that prevented defendant from raising this claim in 2011 with his initial petition.

¶ 47    Of course, everything discussed so far pales in comparison to the most notable reason, independent of *Upshaw*, as to why defendant has not made a *prima facie* showing that an objective factor prevented him from raising this claim in his initial post-conviction petition. The fact that Jones lied to the grand jury about his name, and that defendant's trial attorney did not cross-examine Jones about that fact, were not secrets. These were not facts that came to light years later by random chance or diligent investigation. Jones testified at trial, in front of codefendant Morrell's jury, that he lied about his name to the grand jury. Defendant's jury may not have been present for that testimony, but defendant was present. Simply put, this information was known to defendant all along. We cannot say that he has made even a *prima facie* showing of an objective

factor that prevented him from raising this claim with his initial petition in 2011 when this information was known to defendant since 2007.

¶ 48    Accordingly, defendant has not established the requisite cause prong of the cause-and-prejudice test.

¶ 49                                    B. Prejudice

¶ 50    Defendant must show both cause and prejudice, and because we have already determined that he did not establish cause, we need not consider whether defendant established prejudice. 725 ILCS 5/122-1(f).

¶ 51    However, even assuming that defendant established cause and proceeding with the analysis, we cannot find that trial counsel's failure to cross-examine Jones about his false name, and appellate counsel's failure to pursue the issue, were errors that so infected the entire trial that the resulting conviction or sentence violates due process. *Smith*, 2014 IL 115946 at ¶ 37; 725 ILCS 5/122-1(f).

¶ 52    Our jurisprudence undoubtedly recognizes that the denial of the right to effective assistance of counsel is a denial of due process. *People v. Flores*, 153 Ill. 2d 264, 278 (1992). To sustain a claim of ineffective assistance, a defendant must show both that counsel's performance was deficient, measuring it against an objective standard of competence under prevailing professional norms, and that but for counsel's deficient performance, there was a reasonable probability that the outcome of the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). For our purposes, defendant need only make a *prima facie* showing of ineffective assistance to satisfy the prejudice prong necessary for leave to file a successive petition. *Bailey*, 2017 IL 121450, ¶¶ 22-25.

¶ 53    Nevertheless, the record before us does not support even a *prima facie* showing that trial counsel made an unreasonable, unprofessional error, and that such an error had a reasonable probability of changing the outcome of the case. While defendant's brief insists that the failure to cross-examine Jones about the use of a fake name before the grand jury was a grave error that failed to pursue significant impeachment, even defendant cannot articulate why this error was so prejudicial. Defendant's successive petition, and his brief, claim that Jones testified that on the day of the shooting he believed he was under arrest and thought he was a suspect, and that is what caused him to lie to the police and the grand jury. But codefendant Morrell's cross-examination of Jones, the cross-examination in which defendant claims his attorney should have engaged, only revealed one lie: that Jones used a fake name in front of the grand jury because he feared he had an outstanding warrant for his arrest based on an unrelated parole violation. Jones never wavered in his claims that defendant discharged a firearm at Dunlap.

¶ 54    Defendant's attempt to demonstrate prejudice boils down to an assertion that codefendant Morrell's attorney cross-examined Jones on his use of a fake name, and codefendant Morrell was acquitted, apparently attempting to draw a causal relationship between those two facts. The implication of defendant's assertion is clear enough: if his attorney had also cross-examined on this fact, he too would have been acquitted. The logic there is suspect, at best.

¶ 55    It firstly assumes, without evidence or support, that the jury acquitted codefendant Morrell because Jones lied about his name. Secondly, it ignores the fact that the allegations about defendant's conduct were dramatically different than those pertaining to codefendant Morrell. Multiple witnesses testified that defendant discharged a firearm at Dunlap. No witnesses, and no forensic evidence, supported the conclusion that codefendant Morrell shot Dunlap. The State's

entire argument as to codefendant Morrell's guilt was based on accountability. As a result, guilt hinged on whether the jury accepted that handing a gun to defendant and saying, "here, killer," rose to the level of soliciting, aiding, abetting, agreeing, or attempting to aid another party in the planning or commission of the principal offense. *See* 720 ILCS 5/5-2. Thus, attempting to tie codefendant Morrell's cross-examination about Jones' fake name to the acquittal is tenuous at best.

¶ 56    Even if we were to assume that cross-examination of Jones on this single, collateral point would have wholly discredited him in the eyes of the jury, and it was an error not to cross-examine him on this point, we are still left wanting for prejudice. We could remove Jones' testimony from the equation entirely, and ample evidence of the defendant's guilt remains. *See People v. Rogers*, 197 Ill. 2d 216, 222 (Illinois courts "have consistently upheld the dismissal of a post-conviction petition where the record from the original trial proceedings contradicts the defendant's allegations.")

¶ 57    Jones was far from the only witness who implicated defendant in the killing of Dunlap. Shipp also testified that codefendant Morrell handed defendant a gun and that defendant fired at Dunlap multiple times. Likewise, although Smith testified that he was inside a building at the time of the shooting, his written statement and grand jury testimony that aligned with the testimony of Jones and Shipp were admitted and published to the jury. Crucially, defendant confessed to Vovos that his brother handed him a gun and that he fired multiple times at Dunlap.

¶ 58    Finally, even though tests of defendant's hands for traditional gunshot residue particles, including antimony, were negative, defendant was not excluded as the shooter. The trace evidence analyst, Robert Berk, detected tin in the particles taken from defendant's hands, and the ammunition found at the scene was a rare brand that is manufactured using tin. When that

ammunition is fired, the tin is vaporized along with the other elemental components and can cause tin to be present in the particles that are formed. He also noted that tin and antimony are adjacent to each other on the Periodic Table of Elements, and that the presence of tin can mask the presence of antimony during testing.

¶ 59    Thus, we cannot say that there is any merit, even at a *prima facie* level, to the idea that trial counsel's failure to cross-examine on the single point that Jones used a false name when testifying before the grand jury had a reasonable probability of changing the outcome. Given Jones' significant criminal history, it is unlikely that this one fact would have prompted the jury to find Jones' testimony incredible if it had not done so already. But even if we assume this one fact would have destroyed Jones' credibility, there was significant evidence of defendant's guilt, including a confession, such that failing to pursue this line of cross-examination could not have changed the outcome.

¶ 60    Likewise, for the same reasons we have articulated, appellate counsel was not ineffective for failing to argue trial counsel's ineffectiveness on this point on direct appeal.

¶ 61    Accordingly, defendant has also failed to establish the prejudice necessary to be granted leave to file his successive petition.

¶ 62                                    III. CONCLUSION

¶ 63    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 64    Affirmed.