2023 IL App (1st) 221100-U

No. 1-22-1100

Third Division
November 22, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 09 C6 62100 |
| v. | ) ) | The Honorable |
| LASHAWN JEFFERSON, | ) ) | Geraldine D'Souza, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held:* The circuit court's second-stage dismissal of defendant's postconviction petition is affirmed, as defendant failed to make a substantial showing that he was denied the effective assistance of trial counsel based on the failure to call alibi witnesses and the failure to introduce the contents of a police report.

¶ 2    After a jury trial, defendant LaShawn Jefferson was convicted of armed robbery (720 ILCS 5/18-2 (West 2008)) and sentenced to 35 years' imprisonment. On direct appeal, defendant challenged both his conviction and his sentence, and we affirmed. *People v. Jefferson*, 2014 IL App (1st) 120752-U, ¶ 2. Defendant subsequently filed a petition for postconviction relief

under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), alleging ineffective assistance of trial counsel, which the circuit court dismissed at the second stage. Defendant now appeals, claiming that his petition made a substantial showing of a constitutional violation. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        Defendant's charges stem from the armed robbery of Michael Piwnicki and the attempted armed robbery of Elodia Guillermo and Denah Zygadlo[1] during the early morning hours of November 21, 2009. Following an initial mistrial due to a hung jury, defendant was retried and convicted in 2011. As the evidence presented at the first trial is relevant to defendant's arguments in the instant appeal, we relate the evidence presented at both trials, taking our facts from our prior decision as applicable.

¶ 5                                    *First Trial*

¶ 6        Defendant's first trial occurred between July 27 and August 1, 2011. The evidence presented by the State established the following.[2]

¶ 7        Defendant, accompanied by a man and a woman, entered Eagle Liquor Store[3] in Chicago Heights on November 20, 2009, shortly before midnight. They approached the sales counter, where the store clerk, Ismael Gonzalez, observed defendant wearing black jeans and a "black hoodie" with the hood down, revealing his face. At the counter, the trio attempted to purchase alcohol, but could not produce enough money to pay for the item. The woman in the group

---

[1] Zygadlo is sometimes spelled "Zygaldo" in the record on appeal.

[2] We note that this recitation of the facts comes primarily from our prior decision, which related the facts established during defendant's second trial. The State's witnesses testified consistently in both trials, however, so we include the discussion of their testimony here, where it was first given, with changes to reflect the testimony from the first trial where applicable.

[3] The store was also known as "Verges'" after the name of the store owner.

walked over to the entrance of the store, where "four or five" men were standing in the entryway; like defendant, these men were dressed in "black hoodies." She asked if the men could cover the purchase of the alcohol. When she returned to the counter, however, the three still lacked sufficient funds, so Gonzalez returned the alcohol to the shelf and the group proceeded to leave the store. As they were leaving, Gonzalez heard defendant say "that they were going to rob somebody tonight, that it was going to be a stickup."

¶ 8    At approximately midnight that same evening, Michael Piwnicki was the lone customer at Enzo's Restaurant, which was across a vacant lot from the liquor store. Two employees, Denah Zygadlo and Elodia Guillermo, were working in the restaurant at the time, with Zygadlo attending the cash register while Guillermo went to a storage room to begin preparing Piwnicki's order. As Piwnicki waited for his order, defendant entered the restaurant with the hood of his sweatshirt now covering the top of his head and a dark navy or black bandanna or mask across the lower part of his face. Defendant approached Zygadlo at the cash register and demanded that she open the register and give him the money inside. He repeated his demand several times before pulling a black revolver from his waistband and pointing it at her head, asking "do you think this is a game?" and again demanding that she open the register. Zygadlo said that she would, but began walking backwards toward the storage room with her hands up. At the same time, Guillermo returned from the storage room where she had been preparing Piwnicki's order to witness defendant pointing a handgun at Zygadlo while she backed away. Zygadlo backed into the storage room and used a metal cart which held bags of charcoal to bar the door. Seconds later, Guillermo ran out the back door. Both Zygadlo and Guillermo called 911 from their cell phones.

¶ 9     At that point, defendant turned to Piwnicki and ordered him to his knees. Piwnicki complied, placing his cell phone on the floor and handing over the cash in his hand, which he had been planning on using to pay for his meal. Defendant demanded that he empty his pockets, and Piwnicki again complied. Defendant retrieved the items from Piwnicki's pockets and moved over to the sales counter, where he attempted to open the cash register by flipping it over and "hitting it." Unable to open the register, defendant left the restaurant.

¶ 10    A few minutes later, Piwnicki went next door to the liquor store, where he informed Gonzalez that he had just been robbed and requested any video recording of the outside of the store. Gonzalez informed Piwnicki that the store had no exterior cameras; while there were interior cameras, they were not operating at the time. Piwnicki left the store and walked back to the restaurant.

¶ 11    Chicago Heights police officers and detectives arrived at the scene shortly after midnight on November 21, 2009, and obtained descriptions from the various witnesses. Piwnicki testified that he described the offender as a black male, approximately 6'1" tall and 200 pounds, dressed in black with his face covered. His description did not include the offender's complexion or his age. Gonzalez described the suspect as taller and fairer skinned than the other men in or near the store, and also noted the offender was wearing a black hooded sweatshirt and black pants. Zygadlo's description referred to the suspect as a light-skinned black male approximately 210 pounds and 6 feet to 6'1" tall. He was wearing black pants, a black bandanna, and a black hooded sweatshirt with the hood up. Zygadlo further testified that she also informed police that "[t]here was just something about his eyes, you know, that looked different." Guillermo, having fled into the alley after only a few seconds, could only describe the suspect as a black male wearing black clothing and a black bandanna. Both Zygadlo and

4

Guillermo testified that defendant had also frequented the restaurant as a returning customer, but neither informed the police of this fact at the time of the robbery.

¶ 12    On November 30, 2009, several days later, defendant entered the restaurant as a customer. Guillermo was working the register and immediately recognized him as the man who had attempted to rob the store and subtly informed her supervisor of that fact. The supervisor then contacted the police. Meanwhile, defendant approached the register and placed his order. As defendant ate his meal in the restaurant, two detectives arrived; several uniformed police officers also entered the restaurant, although some of them ordered food. Guillermo identified defendant as the robber to the detectives. Moments later, Zygadlo arrived at the restaurant, where she immediately recognized defendant as the robber and had a physical reaction, becoming "nervous" and "shak[ing]." She repeatedly informed the detectives, "that is the guy that robbed us." The police then arrested defendant.

¶ 13    On December 2, 2009, a detective presented Gonzalez with a physical lineup, and Gonzalez identified defendant as the man from the liquor store who had made the statement about "someone getting robbed tonight." The police did not present such a lineup to Piwnicki, who made his formal identification of defendant in court.

¶ 14    In his defense, defendant presented the testimony of three witnesses—Officer Roger Wilson, Ramona Mosby, and Rhonda Mosby—in addition to testifying on his own behalf.

¶ 15    Officer Wilson testified that he was dispatched to Enzo's Restaurant based on a call of an armed robbery in progress. He had been provided a description of the suspect by dispatch, which he memorialized in a police report; while at the scene, he interviewed Piwnicki, Guillermo, and Zygadlo, who confirmed the description. Wilson testified that Guillermo did not indicate that there was "something special about" the suspect's eyes, and that if she had,

such information would have been included in his report. Wilson further testified that Zygadlo did not inform him that the suspect had bulging eyes, had no hair, and was lacking eyebrows or eyelashes and that if she had, such information would have been included in his report.[4]

¶ 16    Ramona Mosby (Ramona) testified that at the time of the robbery, she was living with her two siblings and her mother, Rhonda Mosby (Rhonda), and was friends with defendant. On November 20, 2009, Ramona and defendant visited Eagle Liquor Store to purchase some items, then returned to her home, where they watched movies in her bedroom. Defendant purchased cigarettes and a beer from the liquor store, and they visited in the early evening, before dark; defendant was wearing a navy and tan jacket, blue jeans, and a tan skullcap, and was not wearing a "hoodie" or a scarf. Ramona's mother and sister were home when they arrived, in a room near the front of the residence. Defendant spent the night at the home, sleeping on the couch in the living room and leaving at approximately 2 or 3 the next afternoon. Defendant was asleep on the couch at the time that Ramona went to bed at approximately 2 a.m. Ramona testified that the only time defendant left the home was when he went downstairs to ask a neighbor to move her vehicle; if he had left while in the living room, Ramona would have heard him from her bedroom. Ramona further testified that when she heard that defendant had been arrested, she and her mother told the police that he had been with them at the time of the robbery.

¶ 17    Rhonda also testified that defendant was at her home on November 20, 2009, and spent the night. Rhonda testified that he had stopped by to visit Ramona on the afternoon of November 20, and Rhonda asked him to assist her with moving a stove the next day. Defendant and

_____

[4] Defendant has alopecia, which the record shows resulted in the defendant having no hair, no eyebrows, and no eyelashes, in addition to "bulging" eyes.

Ramona left the home early in the evening, then returned within approximately 20 minutes with cigarettes and a beer. Rhonda testified that defendant was wearing a new coat and skullcap, which she recalled because he had commented that "I'm not gonna get my new coat dirty" in moving the stove; the coat was navy with tan stripes and had a matching skullcap. Defendant remained at the home until the next day, leaving only to ask the downstairs neighbor to move her vehicle in the driveway.

¶ 18        Defendant testified that in the afternoon of November 20, 2009, he spent time with his girlfriend, then walked from her home to the Mosbys' home at approximately 1 p.m. Defendant remained with the Mosbys for the afternoon, then went to Eagle Liquor Store with Ramona, where he purchased a beer and a pack of cigarettes. They then returned to the home, where they remained for the evening, watching movies. The only time defendant left was to ask the downstairs neighbor to move her vehicle. Defendant spent the night in the Mosbys' home, sleeping on the couch. The next day, defendant assisted them in moving a stove, then returned to his girlfriend's house. Defendant denied ever visiting Enzo's Restaurant on November 20, 2009, and denied robbing anybody. Defendant, however, visited the restaurant on November 30, 2009, where he ordered a meal, walked to the liquor store, then returned to the restaurant to sit and eat. While he was eating, he was approached by police and arrested. Defendant testified that he had been a regular customer at the restaurant since beginning to date his girlfriend, who lived in the area; defendant estimated he visited it twice a week for the past six months.

¶ 19        After defendant's testimony, the State presented the testimony of Officer William Bulanda as a rebuttal witness. Bulanda testified that he took defendant into custody on November 30, 2009, while he was eating at the restaurant. As he was being handcuffed, defendant asked why

he was being arrested, and Bulanda responded that he had no information other than that detectives wished to speak with defendant. On the way to the police station, however, defendant told Bulanda that " 'you are saying I robbed someone, why would I eat there.' "

¶ 20    After deliberating for over a day, the jury informed the court that it was hopelessly deadlocked, and the court declared a mistrial.

¶ 21                                    *Second Trial*

¶ 22    Defendant's retrial was scheduled to begin on September 19, 2011. On that date, defense counsel indicated that "Romona [*sic*] Mosbey [*sic*] is in labor as we speak, so we're not answering ready because she is a necessary witness to our defense." Defendant's retrial ultimately occurred between November 29 and December 1, 2011.

¶ 23    The State's evidence during the retrial was largely the same as in the first trial, including the testimony of Gonzalez, Piwnicki, Guillermo, and Zygadlo. In his defense, however, defendant presented only the testimony of Officer Wilson; neither defendant nor the Mosbys testified. During Wilson's testimony, defense counsel informed the trial court that she wished to impeach the witnesses as to their testimony that defendant was bald by using Wilson's police report, which listed the suspect as having " 'Black hair.' " The trial court, however, ruled that the information in the police report constituted hearsay and was not admissible, and defense counsel did not introduce any evidence as to the suspect's hair or any other description of the suspect contained in the police report.

¶ 24    After deliberations, the jury found defendant guilty of the armed robbery of Piwnicki and the attempted armed robbery of Zygadlo and not guilty of the attempted armed robbery of Guillermo. The trial court entered judgment on the verdict, and defendant was ultimately

sentenced to 35 years in the Illinois Department of Corrections, followed by 3 years of mandatory supervised release.

¶ 25                                    *Direct Appeal*

¶ 26        Defendant appealed both his conviction and sentence, claiming that the evidence was insufficient to convict him beyond a reasonable doubt and that his sentence was excessive. *Jefferson*, 2014 IL App (1st) 120752-U, ¶ 2. Specifically, he contended that the evidence was insufficient where (1) the witness identifications were unreliable and unworthy of belief and (2) it was incredible that he would return to the restaurant as a customer, especially in the presence of police officers, if he had actually attempted to rob the establishment. *Id.* ¶¶ 21, 25. Defendant also argued that his sentence was excessive where the trial court failed to properly weigh the mitigating and aggravating factors. *Id.* ¶ 30. After considering defendant's arguments, we affirmed both his conviction and his sentence. *Id.* ¶ 32.

¶ 27                                *Postconviction Proceedings*

¶ 28        In 2015, defendant filed a *pro se* postconviction petition; it was docketed and he was appointed an attorney, who filed a supplemental postconviction petition in 2021. In the supplemental petition, defendant alleged that he was denied the effective assistance of counsel during his second trial, (1) where trial counsel failed to call the Mosbys as alibi witnesses and (2) where trial counsel failed to introduce evidence that the police report listed the offender as having black hair. Additionally, to the extent that defendant could be deemed to have forfeited his claims, defendant alleged ineffective assistance of appellate counsel for failing to raise the ineffectiveness arguments on direct appeal.

¶ 29        Attached to the supplemental postconviction petition, were *inter alia*, the affidavits of both Mosbys, in which they averred that they testified truthfully during defendant's first trial, they

9

were present in the courthouse at the time of defendant's second trial, and they were willing to testify on defendant's behalf but were not called as witnesses. Also attached to the supplemental postconviction petition was Officer Wilson's police report, which listed "BLK" in the box describing the suspect's hair color.

¶ 30    The State filed a motion to dismiss the postconviction petition, contending that defendant's claims of ineffective assistance failed where the decision to call witnesses was a matter of trial strategy and defendant's claim concerning the failure to introduce the information contained in the police report could have been raised on direct appeal and was therefore waived. The circuit court granted the State's motion to dismiss on July 22, 2022, and this appeal follows.

¶ 31                                ANALYSIS

¶ 32    On appeal, defendant contends that his postconviction petition should have been advanced to the third stage for an evidentiary hearing where he made a substantial showing that he was denied the effective assistance of counsel.

¶ 33                        *Post-Conviction Hearing Act*

¶ 34    The Act provides a framework for incarcerated individuals to collaterally attack their convictions by establishing the substantial denial of a constitutional right during trial or sentencing. 725 ILCS 5/122-1(a)(1) (West 2014). Claims are limited to those that were not and could not have been previously litigated. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Proceedings under the Act occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the circuit court determines whether a petition is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2014). At the second stage, the court may appoint counsel to represent an indigent defendant and, if necessary, to file an amended petition; at this stage, the State must either move to dismiss or answer the petition. *Gaultney*,

174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2014). Only if the petition and accompanying documentation make a substantial showing of a constitutional violation will the defendant proceed to the third stage, an evidentiary hearing on the merits. *People v. Silagy*, 116 Ill. 2d 357, 365 (1987); 725 ILCS 5/122-6 (West 2014).

¶ 35    In the instant case, defendant's petition was dismissed at the second stage, so we must determine whether defendant's petition made a substantial showing of a constitutional violation. To make a substantial showing, a defendant must demonstrate that his well-pled allegations, if established at the evidentiary hearing, would entitle him to relief. *People v. Domagala*, 2013 IL 113688, ¶ 35. The dismissal of a postconviction petition without an evidentiary hearing is reviewed *de novo. People v. Cotto*, 2016 IL 119006, ¶ 24. *De novo* consideration means that the reviewing court performs the same analysis the circuit court would perform and owes no deference to the lower court's judgment or reasoning. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 34.

¶ 36                          *Ineffective Assistance of Counsel*

¶ 37    As noted, on appeal, defendant maintains that he was denied the effective assistance of counsel. In order to determine whether a defendant was denied his right to effective assistance of counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and that he was prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; see also *People v. Briones*, 352 Ill. App. 3d 913, 917 (2004).

¶ 38    In this case, defendant claims that his trial counsel was ineffective for failing to present the Mosbys as alibi witnesses and for failing to introduce the fact that Officer Wilson's police report described the suspect as having black hair. We consider each argument in turn.

¶ 39    First, defendant contends that trial counsel was ineffective for failing to present the alibi testimony of the Mosbys, who had testified at the first trial and were ready and willing to testify at the retrial. Generally, the decision as to whether to call a particular witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel. *People v. Flores*, 128 Ill. 2d 66, 85-86 (1989). Nevertheless, "counsel may be deemed ineffective for failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense." *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999); see also *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 39. Additionally, "strategic decisions may be made only after there has been a thorough investigation of law and facts relevant to plausible options" (internal quotation marks omitted), so the failure to interview witnesses may indicate actual incompetence, especially where those witnesses are known to trial counsel and their testimony may be exonerating. *Upshaw*, 2017 IL App (1st) 151405, ¶ 39.

¶ 40    In this case, we have the relatively unusual situation in which trial counsel was not only aware of the Mosbys but was also aware of exactly what their testimony was likely to be, as they had already provided it once, during defendant's first trial. Based on defense counsel's comments concerning Ramona's childbirth, it appears that defense counsel was planning on calling the Mosbys as witnesses during the retrial, but ultimately decided not to do so. Instead, defense counsel presented a defense based solely on a misidentification theory, which rendered the Mosbys' testimony unnecessary. We cannot find that this decision was anything other than

12

pure trial strategy, and therefore cannot find that defendant has made a substantial showing of a constitutional violation. Defense counsel clearly was aware of the possibility of an alibi theory of defense—the same attorney represented defendant during both trials, and she had presented an alibi theory during defendant's first trial, along with the misidentification theory which she repeated during the retrial. The defense presented at the first trial was not wholly successful, though, as the jury was unable to reach a verdict. It was thus entirely reasonable for defense counsel to make the decision to change the trial strategy upon retrial, especially where the alibi theory required admitting that defendant had been at the liquor store on the day of the robbery. Moreover, defense counsel had the opportunity to assess the alibi witnesses as they testified during the first trial, and to compare their credibility with that of the State's witnesses. She may well have concluded that defendant's case was stronger without their testimony, especially where there were some inconsistencies between the two witnesses.

¶ 41     We do not find persuasive any of the cases cited by defendant in support of his ineffectiveness argument, as all of them are factually distinguishable. For instance, in *Upshaw*, 2017 IL App (1st) 151405, ¶ 40, defense counsel failed to interview a potential alibi witness or even investigate the defendant's alibi, and "[t]he record suggest[ed] no strategic reason" for counsel's failure to do so. Similarly, in *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 61, the defendant was entitled to a third-stage evidentiary hearing based on "defense counsel's failure to investigate fully the possible testimony of exculpatory witnesses." Here, by contrast, defense counsel not only investigated a possible alibi defense, but was also fully aware of the likely testimony that would be provided by the witnesses, as they had already provided it at defendant's first trial.

¶ 42    Moreover, even the cases cited by defendant which involve the failure to call witnesses at trial are inapposite. In both *Tate*, 305 Ill. App. 3d 607, and *People v. King*, 316 Ill. App. 3d 901 (2000), defense counsel focused on attacking the credibility of the State's witnesses instead of presenting allegedly exculpatory evidence. In *Tate*, however, we found that the record did not reflect whether trial counsel's decision was a "professionally reasonable tactical decision" or the result of incompetence, and further evidence was therefore required. *Tate*, 305 Ill. App. 3d at 612. In *King*, we remanded for a new trial where the defense chose to attack only one of the State's three witnesses and provided no evidence at an evidentiary hearing demonstrating a reasonable explanation for failing to call an alibi witness. *King*, 316 Ill. App. 3d at 916. In this case, again, defense counsel was fully aware of the likely testimony of both Mosbys, and the record reflects a reasonable explanation for not calling them, namely, the fact that defendant would be placing himself in the liquor store on the day of the robbery, as well as the fact that the defense was not wholly successful the first time. We therefore cannot find that the circuit court erred in dismissing defendant's ineffectiveness claim at the second stage.

¶ 43    We similarly cannot find that defendant has made a substantial showing of ineffectiveness of trial counsel based on the failure to introduce evidence that Officer Wilson's police report reflected that the suspect had black hair. Defendant acknowledges that police reports are generally admissible only for impeachment purposes and not as substantive evidence. See *People v. Shief*, 312 Ill. App. 3d 673, 680 (2000). He claims, however, that a reasonable attorney "would have relied on the report as impeachment to show one or more eyewitnesses said the offender had black hair when [defendant] has alopecia." Defendant fails to acknowledge, though, that defense counsel *did* attempt to use the report as impeachment

evidence but was not permitted to do so, as the trial court ruled in the State's favor on its hearsay objection.

¶ 44 Prior to Officer Wilson's testimony, the State requested an offer of proof as to what testimony Wilson would be impeaching, and the trial court determined that the only proper impeachment would be as to Guillermo's testimony that the bandanna she observed was black and white, not entirely black; none of the other witnesses provided testimony which would be subject to impeachment based on the police report. During Wilson's testimony, defense counsel nevertheless attempted to elicit evidence as to the suspect's hair color to impeach "[e]very individual who reported that they knew that the person was bald," but the trial court determined that such evidence was improper hearsay. We thus cannot find that defense counsel failed to attempt to use the information contained in the police report, as defendant contends. It is important to note that this was defendant's second trial on this matter and, at the first trial, the State's witnesses answered questions in a way which subjected them to impeachment by Wilson. It is natural that, on retrial, those same witnesses would provide testimony in such a manner so as to foreclose similar impeachment. Where there was simply no testimony to impeach, we cannot fault defense counsel for her inability to introduce the contents of the police report. Accordingly, the circuit court properly dismissed defendant's postconviction petition at the second stage, as defendant failed to make a substantial showing of a constitutional violation.

¶ 45                                                    CONCLUSION

¶ 46 For the reasons set forth above, we affirm the circuit court's dismissal of defendant's postconviction petition at the second stage, where defendant failed to make a substantial

showing that his trial counsel was ineffective in failing to call alibi witnesses or introduce evidence contained in the police report.

¶ 47          Affirmed.